C. E. COLTON, APPELLANT, v. MATTHEW BENES ET AL., APPELLEES.

126 N. W. 2d 652

Filed March 6, 1964. No. 35427.

John A. Wagoner, for appellant.

Luebs, Elson, Tracy & Huebner and Wear, Boland, Mullin & Walsh, for appellees.

Heard before WHITE, C. J., CARTER, MESSMORE, SPENCER, BOSLAUGH, and BROWER, JJ., and LYNCH, District Judge.

BROWER, J.

This action was brought by the plaintiff and appellant, C. E. Colton, against the defendants and appellees, Matthew Benes and Louis Benes, in the district court for Hall County, Nebraska, to recover damages which resulted from an automobile accident which took place at the intersection of Eddy and Division Streets in the City of Grand Island, Nebraska.

The plaintiff will be designated as such, or as Colton, and the defendants either as such or when necessary by their respective names.

The plaintiff's petition alleged that the automobile of the defendants at the time of the accident was driven by Matthew Benes; and that Matthew and Louis Benes were the joint owners thereof. It attributed negligence to the defendants in several respects among which are the following which were submitted to the jury by the court in its instructions, to wit: That the defendant driver failed to keep a proper lookout; failed to keep his vehicle under reasonable control; failed to yield the right-of-way to the plaintiff's vehicle driven on Eddy Street, an arterial street designated as such by city ordinance; and failed to give timely warning of his intention to usurp the intersection. Other allegations of negligence were stated and submitted to the jury which are not necessary to be mentioned in the absence of a cross-appeal.

The defendants' separate answers admitted the time and place of the accident and that it involved a vehicle driven by plaintiff with that of one driven by Matthew Benes. They denied any negligence on the part of the driver of defendants' automobile and alleged contributory negligence on the part of the plaintiff in several respects, including the following which were submitted to

the jury: That he failed and neglected to keep a sufficient lookout; that he failed to keep his vehicle under reasonable and proper control; that upon seeing the approach of defendants' vehicle he failed and neglected to timely apply his brakes to avoid colliding with it; and that he failed to turn to the left so as to avoid the accident. The plaintiff by reply traversed these allegations of the defendants.

The trial court by its instructions submitted the issues as to the negligence of the defendants and the contributory negligence of the plaintiff with the usual instruction permitting the reduction of the amount of the verdict in case the jury should find plaintiff guilty of slight contributory negligence and the negligence of the defendants gross in comparison therewith.

The jury returned a verdict for the plaintiff in the amount of $3,376.40. Plaintiff filed a motion for new trial which was overruled and he has brought the cause to this court by appeal.

The plaintiff assigns error in the giving of instructions Nos. 3, 4, and 5. These instructions are complained of because the issue of the plaintiff's contributory negligence was through them submitted to the jury. Plaintiff's first contention is that there was no evidence in the case which permitted that issue to be considered by the jury. If that contention is sustained by this court it will be unnecessary to consider the particular errors with respect to the several instructions.

To determine this assignment of error it is first necessary to review the evidence as disclosed by the bill of exceptions.

Eddy and Division Streets cross at right angles. Though both run at a considerable variance with the directions of the compass they will be treated herein as if Eddy Street ran north and south and Division Street east and west. Both streets and their intersection were paved. Eddy Street where the collision occurred was an arterial street which was protected by stop signs. Eddy Street

is 37.1 feet wide to the north of the intersection. Division Street is 41 feet wide on the west thereof. There is a slight variance without significance here in the width of each street respectively on the opposite side of this intersection. Stop signs are present at the northeast and southwest of the intersection requiring vehicles on Division Street to stop before entering Eddy Street. The one at the southwest corner of the intersection is approximately 9 feet west of the west curb of Eddy Street and 5.8 feet south of the south curb of Division Street. It is 6 feet in height from the ground to the base of the octangle sign itself. The sign is similar as to size to the usual stop sign and bears white lettering upon a red background. From the photographs in evidence there appears no obstruction to impair the vision of a driver approaching it from the west on Division Street.

At approximately 11:30 o'clock on Sunday morning, September 27, 1959, the plaintiff Colton was driving his own 1950 Chevrolet panel truck, approaching this intersection from the north.

At the same time the defendant Matthew Benes was driving a 1959 Ford two-door sedan eastward on Division Street toward the same intersection. He was accompanied by his brother Louis Benes, the other defendant, who sat to his right on the front seat. The sedan was owned by the two brothers who were partners engaged in farming operations near Chapman, Nebraska. At the time of the accident it was a nice clear day and the streets were dry.

No other automobile at that time preceded or followed either vehicle and no witness who actually saw the accident testified except the parties themselves. Their testimony is here summarized. On direct examination by his counsel the plaintiff stated that he knew as he approached the intersection that Eddy Street was an arterial highway. When he was probably a car length from the intersection he noticed an automobile, afterwards identified as belonging to the defendants, approaching from the west.

It was then probably 3 or 4 car lengths from the intersection. He also observed people walking across Eddy Street in the block to the south. His own panel truck was then proceeding about 20 miles an hour. This speed could have varied 1 or 2 miles either way. As he continued and moved into the intersection he saw that the defendants' car wasn't going to stop. He immediately applied the brakes and was successful in stopping his car. There was a collision however. His panel truck was struck on its right side just on the trailing edge of the door and back of it. After the accident he was lying cn his right side on the right of the truck seat. After a short interval he got out on the left side of the car and walked around to the back. The defendants' automobile was still against the panel truck but was starting to back away. It backed up approximately even with the stop sign and clear of the sidewalk there. The defendants got out of their sedan and came around together, and he had a conversation with one of them, probably Matthew Benes. This defendant said they didn't see the stop sign. Plaintiff called the police and later officer Robert L. Starr came to the scene.

On cross-examination he testified his windshield and windows were clear; and that he knew at times others went through stop signs. The defendants' automobile was first noticed when the plaintiff was a car length and a half from the intersection. This was when he first looked to the west and was the first time one was able to see any material amount of that street because of "houses and things." He thought his truck was 20 or 25 feet long and he was that distance or maybe more from the north line of Division Street when he first noticed the defendants' car. Defendants' sedan was then 3 or 4 car lengths west of the intersection. He admitted he might have said this distance was 2 or 3 car lengths distant in a previous deposition. The defendants' automobile then appeared to be slowing down. Plaintiff's truck was then proceeding at 18 to 20 miles an

hour. He did not know in what distance he could bring his truck to a stop at that speed. When he saw the defendants' automobile he simultaneously saw people walking in the next block. He looked up the street and saw these people walking and then turned his attention back to approaching traffic. He admitted stating in a deposition he had turned his attention to them because he was on an arterial highway protected by stop signs. His brakes were not applied when he first saw defendants' car. After he looked back and saw defendants' car was coming on he applied them. Although he did not know precisely, he thought his truck probably traveled 40 feet more or less before it collided with defendants' car. In driving as he approached the intersection he had his hands on the steering wheel. After observing the pedestrians he looked back and saw defendants' sedan coming towards him in the intersection and he realized it was going to strike his automobile unless he could get stopped. There was no time to sound his horn as he was too busy trying to stop.

Matthew Benes, on direct examination in his own behalf, stated he had driven automobiles and trucks for 21 years. The mechanical condition of his 1959 Ford at the time of the accident was good. As they approached Eddy Street from the west they were on the south or righthand side of Division Street. No cars were ahead of them. He was not familiar with the intersection. A half block back from the intersection his automobile was proceeding at 20 or 25 miles an hour. Its speed was slowed to 10 or 15 miles an hour as it approched the intersection. He first looked south and then north and "spotted" Colton's truck when the speed of his own automobile was 10 or 15 miles an hour. Colton's truck was then about 10 or 15 feet north of the north curb of "*Eddy*"; he applied his brakes; he did not know how fast Colton's panel truck was going; defendants' sedan slid into the "side of him" at which time it was going less than 5 miles on hour; and the contact resulted in a slight

bump like bumping a curb in parking vertically. Defendants' car was then traveling east. Colton's truck was going south, possibly a little east. The left front fender or left front of defendants' sedan collided with the right side of plaintiff's truck behind the door panel and the fender. After the accident he backed his automobile back of the curb and both defendants got out and went to Colton's panel truck. Police officer Starr came and a complaint was filed against him by the plaintiff for running a stop sign. He did not see the stop sign before the accident.

On cross-examination he said he first looked to the south; that the stop sign was located at the southwest corner; and that he was not prevented from seeing it by obstructions. His speed when he put on the brakes was 10 or 15 miles an hour. He did not stop before entering Eddy Street. The panel truck appeared to have been moved about a foot east after the accident. Colton's truck was moving slightly at the time of the impact. Defendants' sedan was skidding as it went into the intersection. The paving was dry and no traffic was approaching from the east. His automobile was about 5 feet from the intersection when he applied the brakes. It was then traveling 10 or 15 miles an hour. He made no effort to turn his car to the right or left but it proceeded straight east. The collision took place south of the centerline of Division Street and west of the centerline of Eddy Street. He pleaded guilty to the charge of "violating the stop sign."

Louis Benes testified on his own behalf. He said he was riding next to his brother in the front seat on the right-hand side. The automobile was going about 20 miles an hour as they approached the intersection. He noticed Colton's truck when their automobile was 10 or 15 feet from the intersection. He observed Matthew applying the brakes. The witness was looking straight ahead following Colton's automobile coming in, and the collision took place. When they collided the defend-

ants' car was going 5 miles an hour. He saw Colton holding the wheel getting ready for the collision.

On cross-examination he stated he couldn't feel the sedan turn to the right or left prior to the collision, but could have felt it if it had. His brother did not stop at the stop sign.

Robert L. Starr, a police officer of the city of Grand Island, at that time operating a patrol car, testified for the plaintiff. He had come to the scene of the accident in pursuance of a call received at 11:35 o'clock, arriving there at 11:45 or 11:50 o'clock. He found the Chevrolet panel truck of plaintiff sitting in the street where it was hit. The defendants' Ford had been moved. The drivers of both vehicles were interviewed by the officer. He stated Benes, when asked how the accident happened, said he was driving east on Division Street, that he didn't see the stop sign, that he ran through it, and that he hit the Chevrolet truck. Colton told him he was traveling south on Eddy Street and "looked up and there he was and I could not get out of his road." The defendants' automobile was damaged on the front bumper. There was debris in the street and he measured from this to the curb of the two streets. The debris was 20 feet north of the south curb of Division Street and 15 feet east of the west curb of Eddy Street. The panel truck was headed in a southerly direction but the back end had been pushed a little to the east.

Charles Beers, an engineer, made a survey of the intersection and a plat drawn to scale is in evidence which shows the width of the streets, the locations of the curbs, and the stop signs. By scaling 20 feet from the south curb of Division Street and 15 feet east of the west curb of Eddy Street, he marked thereon a point 1 foot south and approximately 3½ feet west of the center of the intersection.

There was no evidence given either as to the presence or absence of skid marks. Photographs of the two vehicles are in evidence. Plaintiff's panel truck shows a

considerable dent in the body. The damage extended from the rear edge of the right-hand door to the front portion of the back fender. The photograph of defendants' car is an enlargement showing the left front. It is not very clear and shows little damage.

In Nichols v. McArdle, 170 Neb. 382, 102 N. W. 2d 848, the following rules are set forth which we consider are pertinent to the cause before us: "A motorist traveling on a favored highway protected by a stop sign of which he has knowledge may properly assume that oncoming traffic will obey it.

"A user of highways may assume that other users thereof will use them in a lawful manner and govern his acts in accordance with such assumption unless or until he has warning, notice, or knowledge to the contrary.

"A motorist approaching a highway protected by stop signs must stop before going upon the highway, must look to his left and to his right, and must permit a motor vehicle which is proceeding along the highway protected by stop signs to pass if it is at a distance and is traveling at a speed making it imprudent for the motorist to proceed into the intersection.

"Negligence, which is the moving or effective cause of a happening, is the proximate cause thereof.

"The trial court is required to submit to the jury for its determination only the issues of fact presented by the pleadings and supported by evidence, and it is generally prejudicial error for the trial court to present to the jury for its determination any issue of fact for which there is no proof."

In Gross v. Johnson, 174 Neb. 273, 117 N. W. 2d 534, it was held that though it is the duty of a driver of a motor vehicle to keep a lookout in the direction of anticipated danger he cannot be expected to maintain a constant lookout in one direction.

In a jury case involving issues of negligence where different minds may draw different conclusions or in-

ferences from the evidence adduced, or if there is a conflict in the evidence, the matter at issue must be submitted to the jury, but where the evidence is undisputed or but one reasonable inference or conclusion can be drawn therefrom, the question is one of law for the court. Kuska v. Nichols Constr. Co., 154 Neb. 580, 48 N. W. 2d 682.

The foregoing summary of the evidence shows the parties are in substantial agreement as to what took place. The defendants' automobile did not stop as required at the stop sign. Both defendants testified their Ford sedan as it proceeded towards the intersection was slowed from a speed of 20 to 25 miles an hour to 10 or 15 miles per hour. The plaintiff does not state its speed but does say he saw it slowing as it approached Eddy Street at least 2 and possibly as much as 4 car lengths away. It then of necessity was west of the stop sign which it was approaching. From the rules stated it is obvious that the plaintiff could assume the defendants' car would stop before entering the street unless he had warning or notice or knowledge to the contrary. Neither was he required to give his constant attention to the defendants' car alone. For a space of time which could only have been a fleeting instant, he regarded the pedestrians in the next block to whom he was also obligated. There is nothing to show his speed was excessive under the circumstances. When Colton first saw defendants' sedan, his truck was from one to one and a half car lengths from the intersection. The defendants first saw the truck when it was 10 or 15 feet from it. Matthew Benes applied his brakes. The whole movement across the intersection, had it been completed, would have taken a very few seconds. Glancing back after observing the pedestrians, plaintiff saw defendants' Ford was not going to stop. He applied his brakes at once and he stopped his truck before the impact, according to the plaintiff's testimony. According to Matthew Benes it was moving slightly. Considering the record there is no evidence

that the plaintiff failed or neglected to keep a sufficient lookout, or that his vehicle was not under reasonable and proper control, or that after observing the defendants' vehicle was not stopping as required, he did not timely apply his brakes, or that he could thereafter have avoided the collision by turning to the left or had an opportunity to do so. These were the questions submitted by the trial court to the jury as to the plaintiff's contributory negligence.

This court in Wolcott v. Drake, 162 Neb. 56, 75 N. W. 2d 107, laid down certain rules that are applicable here: "If defendant pleads that the plaintiff was guilty of contributory negligence, the burden is upon him to prove that defense and this burden does not shift during the trial. However, if the evidence adduced by the plaintiff tends to prove that issue, the defendant is entitled to receive the benefit thereof.

"It is essential to the existence of negligence that there be some fault on the part of the person sought to be held liable."

Under these rules the defendants failed in their proof of the plaintiff's contributory negligence. In truth it would appear the collision was caused by the failure of the defendant driver to observe the stop sign and his assumption that his automobile had the directional right-of-way. Further that his action on that assumption was not called to Colton's attention until it was too late for him to stop his truck or alter its course in time to avoid the collision. It was error for the trial court to submit the issue of contributory negligence to the jury.

The plaintiff assigns as error the inadequacy of the verdict returned by the jury. The trial court by submitting the issue of contributory negligence instructed the jury that it might reduce its verdict in accordance with our comparative negligence statute. Because of this a new trial with respect to damages must be had.

The plaintiff assigns error to the trial court in failing to sustain his motion for a mistrial based on defendants'

counsel asking questions concerning the plaintiff "for the last two years having been on retirement pension." The question was never answered and the trial court promptly cautioned the jury to disregard it. Similar objection is made to an unfinished statement of Doctor Yost, a medical witness of the defendants, which plaintiff's counsel concludes was also intended to refer to plaintiff receiving a pension. On the retrial all reference to the plaintiff receiving a pension should be carefully avoided.

There remains plaintiff's contention that the trial court erred in giving instruction No. 10. Because a retrial of the issue of damages will be involved it should be given consideration. The instruction as given by the trial court is here set out. "If you find from a preponderance of the evidence that plaintiff sustained injuries arising out of the motor vehicle accident, it was plaintiff's duty to take all reasonable care of such injuries, and if he failed to take such care, and conducted himself in a manner to aggravate and enhance the alleged injuries, and on account of his failure the injuries were increased or enhanced, he is not entitled to such damages as resulted from his failure to take proper and reasonable care. However, the mere fact that a competent physician may have advised plaintiff to submit to a serious operation does not justify an inference that plaintiff was negligent or unreasonable in failing to have the operation performed. Other factors as they confronted plaintiff must be considered in determining whether or not he exercised reasonable diligence in caring for himself and his injuries. Such other factors are plaintiff's condition in relation to the risks of the proposed operation; the degree of seriousness and danger, if any, involved in the operation; whether or not it would or might permanently maim or otherwise disable him; whether or not possible benefits from the operation are almost certain or are only probable or doubtful; whether or not any alternative method of treat-

ment is available, and, if so, what the comparative possibilities and probabilities are between it and the operation; and whether or not physicians and surgeons agree among themselves as to the advisability of the operation. After considering all or any such factors as are shown by the evidence the jury must decide whether or not the failure of plaintiff to undergo an operation constituted a failure to exercise reasonable diligence in the care of his injuries."

The first sentence of this instruction was the defendants' requested instruction No. 7. One substantially similar was approved by this court in Swift & Co. v. Bleise, 63 Neb. 739, 89 N. W. 310, 57 L. R. A. 147. In the cited case the facts before the court are not disclosed, other than to state that there was some evidence received, which the plaintiff therein conceded, if the proper issues had been raised by answer, might have entitled the defendant therein to have submitted to the jury whether or not the injury was aggravated by the plaintiff's own conduct. The opinion discussed whether such matters raised an issue of contributory negligence, which were required to be pleaded affirmatively, or were matters going only to the mitigation of damages. The court in the cited case held them to be in mitigation of the injuries requiring no affirmative pleading and reversed the judgment, giving as one of its reasons the failure to give this instruction. In the cited case there is no indication that the plaintiff therein required an operation.

In the case before us the parties do not suggest and we do not find anything in the record which suggests the plaintiff's want of care of his injuries aside from evidence which might tend to show he should have submitted to an operation. The trial court apparently took this view also and therefore gave the instruction adding the remaining portions thereto.

We are cited to no cases of this court where such an issue was submitted to a jury in a personal injury action and can find none. However, the case of Simmerman

v. Felthauser, 125 Neb. 795, 251 N. W. 831, throws some light on that question. It was a workmen's compensation case. The court therein said: "The unreasonableness of the refusal of an injured employee to permit an operation to be performed is a question of fact to be determined by the evidence, and the burden of proof to establish that the tendered operation is simple, safe, and reasonably certain to effect a cure is upon the employer. Frost v. United States Fidelity & Guaranty Co., 109 Neb. 161; * * *."

An extended annotation beginning at 48 A. L. R. 2d 346, discusses the duty of an injured person to minimize tort damages by medical or surgical treatment and cites many cases involving the problem. The general rule of substantive law which is the basis for such instructions in those cases which submit the question involved to the jury is set out in this annotation at page 349 as follows: "Those cases are agreed that one injured by another's tort is required to exercise ordinary care to seek medical or surgical treatment so as to effect a cure and minimize damages, on pain of not being allowed to recover from defendant for consequences of the injury which could have been averted by the exercise of such care. * * *

"It has been generally recognized that the plaintiff's duty of reasonable care to seek a cure does not require him to submit to treatment which involves substantial hazard of death or injury, nor even unduly painful treatments, and also that he need not pursue methods which offer only a possibility of cure."

A review of the many cases in this note indicates that in some of the cases the courts have determined whether a person injured by another's tort is required to mitigate his damages by submitting to an operation as a matter of law. Others have submitted it to the jury as a question of fact as to what a reasonably prudent man would do under the circumstances. In the later cases there appears a definite trend to submit the question to the jury where the evidence is sufficient to author-

ize it. This trend arises no doubt from the great strides in surgical procedure by which many operations have become and are becoming increasingly safe and free of hazard. The cases cited in the supplemental service of A. L. R. to this note practically all approve the submission of the question to the jury under proper instructions. Lorenc v Chemirad Corp., 37 N. J. 56, 179 A. 2d 401; Baglio v. New York C. R. R. Co., 344 Mass. 14, 180 N. E. 2d 798; Dark v. Brinkman (La.), 136 So. 2d 463; Martin v. Foss Launch & Tug Co., 59 Wash. 2d 302, 367 P. 2d 981. These cases agree in principal with Simmerman v. Felthauser, *supra*.

The testimony concerning the contemplated operation was related by Dr. House, an orthopedic surgeon and medical witness for the plaintiff. He testified that in his opinion the plaintiff had a nerve root irritation the result of a bony impingement or encroachment between the fifth and sixth cervical vertebrae, causing a narrowing of the joint space, particularly on the right side; and that the plaintiff would require a fusion operation on his neck. The fee therefor according to a certain Nebraska fee schedule would be $300. Such an operation would require future hospitalization of 10 days to 2 weeks and would not be 100 percent effective. This would have a reasonable chance of success based on percentages but he did not state what those percentages were; and that there was a reasonable chance that upon a recovery therefrom he could go back to work and all of his complaints would be taken care of. The doctor said a fusion operation involved the stabilization or growing together of two vertebrae. It would consist of taking a portion of bone, preparing the area of the neck in which to place it, and allowing bone taken from the hip to grow in the neck, where so placed, making this area all one piece. He had recommended such an operation to the plaintiff as early as 1960. Plaintiff testified at the trial in February 1962, that he had been so advised and intended to

have the operation but had not because he could not afford it.

Plaintiff contends there was no evidence upon which the court might have submitted several of the matters for consideration of the jury designated in this instruction as "factors." He asserts there was no evidence as to the risks of the proposed operation; the seriousness and danger involved; or the possibility of the plaintiff being permanently maimed or disabled.

In the cited annotation in 48 A. L. R. 2d 346, many of the different decisions are arranged with respect to the various hazards that arose in the particular cases under paragraphs which have headings corresponding to the propositions set out as "factors" in this instruction. The trial court submitted most of these factors as set out in the headings to those paragraphs without relating the particular hazards to the evidence before it. An instruction should be given in the present case only if there is evidence showing the extent of the hazards to the plaintiff growing out of the operation contemplated. It should then be related only to the risks shown to be involved and which are covered in the evidence without undue repetition.

In the record before us there appears no evidence in the testimony from which the jury might determine the risks and hazards to the plaintiff incident to the proposed operation. The substantive law applicable does not require the injured person to undergo such an operation where the hazards to him are great. In an action in tort for personal injuries the question of whether or not the injured party should have mitigated his damages by submitting to an operation should not be submitted to the jury in the absence of evidence showing the extent of the hazards of death or injury and of the pain or suffering involved.

Further objection by the plaintiff to instruction No. 10 is made because he asserts the evidence does not show the chances or prospects of the plaintiff being benefited

if the operation is performed. Though his doctor does not equate the chances in percentages he does indicate they were reasonable and the plaintiff himself must have deemed them sufficient because he intends to take them. We do not regard the instruction defective in this regard.

In the evidence before us there is no medical testimony in disagreement with that of Dr. House with respect to the contemplated operation. The plaintiff's condition and the other treatment given him however are testified to at length.

It appears from Simmerman v. Felthauser, *supra*, that mitigation of damages being defensive in nature the burden of proving the plaintiff should submit to an operation to lessen his damage is upon the defendant.

The plaintiff further objects to the instruction in that the trial court did not include as an element for the jury to consider the inability of the plaintiff to pay for the same. This is based on his testimony that he could not afford it. There was no further factual evidence in the record. The annotation in 48 A. L. R. 2d at page 371 cites cases holding that where an unreasonable expenditure would be required to undergo the treatment, the injured person is justified in refusing to undergo it. The plaintiff's pecuniary situation is within his own peculiar knowledge and could not be shown by the defendants in the first instance. Under such circumstances the plaintiff's financial condition should be shown if he asserts it as a reason for avoidance of surgery and such testimony should be subject to cross-examination.

Because of the submission of the issue of contributory negligence to the jury herein, the judgment must be reversed and the cause remanded for new trial. The issue of liability having been determined the cause should be tried only as to the damages involved.

The judgment is reversed and the cause remanded for new trial in accordance with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.