NATIONAL FARMERS ORGANIZATION, INC., APPELLEE, v.
McCOOK FEED AND SUPPLY COMPANY, APPELLANT.

243 N. W. 2d 335

Filed June 30, 1976. No. 40406.

David T. Schroeder of Padley & Dudden, and Donald W. Marshall, Jr., for appellant.

Murphy, Pederson & Piccolo, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, NEWTON, CLINTON, and BRODKEY, JJ.

SPENCER, J.

In this contract action for the sale of 90,000 bushels of corn, the jury returned a verdict for the plaintiff on its cause of action and for the defendant on its counterclaim. The trial court sustained a motion for judgment notwithstanding the verdict on the counterclaim. It entered judgment for the plaintiff on its cause of action for the amount the parties stipulated was due, and dismissed the counterclaim. McCook Feed and Sup-

ply Company, hereinafter referred to as defendant or Johnson, appeals. We reverse.

On February 14, 1973, National Farmers Organization, hereinafter referred to as plaintiff or N.F.O., entered into two contracts for the sale by the plaintiff to the defendant of No. 2 yellow corn. One contract was for 45,000 to 50,000 bushels. The other was for 40,000 bushels. The contracts had previously been made orally by Otis Johnson, owner-operator of the defendant, and Boyd Weist, a representative of the plaintiff. The oral contracts were followed by two written sale confirmation forms dated February 14, 1973, which were prepared by the plaintiff. The sale confirmation forms provided an on-farm price for the corn of $1.48 per bushel. The corn was to be picked up by the defendant on the farm. The shipment time was listed as 2 months. The buyer was to make payment at the end of the week for grain picked up that week to the N. F. O. members' custodial account.

Plaintiff is a national collective bargaining association. It represents members in the sale of products and oversees the performance of such sales contracts in return for a check-off of 2 cents per bushel as commission and reserve against loss. The legal title to the corn, which is the subject matter of these contracts, was in the firm of Jack Brothers of Eustis, Nebraska, a farming partnership operated by Robert and Willard Jack. After an earlier deal for the Jack corn fell through, Weist entered into the contract with defendant.

McCook Feed and Supply Company is actually the business name used by Otis Johnson. At the time the contracts were made, he was in the business of buying, hauling, and selling feed; buying, hauling, and selling grain; and custom trucking of commodities for profit. He owned and operated five semi-trucks with trailers, and employed five drivers. The only corn delivered under the contracts in question was picked up by two of

the defendant's trucks on April 14, 1973. A total of 1,714 bushels of the Jack grain were loaded and hauled to Oklahoma.

The circumstances surrounding the performance dates of the contract were the object of some disagreement at the trial. The evidence indicated that the period from February 14 to April 14, 1973, was abnormally wet for the southwestern portion of Nebraska. The Jack corn was located on gravel roads several miles off the regularly traveled paved roads. Defendant's evidence was that his truck drivers periodically drove past the gravel roads leading to the Robert Jack place and found them impassable for the semi-trucks they were driving. Plaintiff's testimony was that there were many days during the contract performance time when the trucks could have reached the corn. On April 14, 1973, Robert Jack told a representative of defendant that he would not allow the delivery of any more corn after that date. There were discussions between the representatives of the plaintiff and defendant in which the defendant stated plaintiff's representatives agreed to extend the time for delivery. The jury by its verdict resolved this question in the defendant's favor.

On May 16, 1973, defendant received a written notice of cancellation of the contract from the plaintiff. The price of corn began to rise steadily during the middle of April. It reached a price of $1.76 per bushel by May 16, 1973. Plaintiff brought this action to recover for the 1,714 bushels of corn delivered to the defendant. The defendant counterclaimed, alleging breach of contract.

Defendant produced evidence of a strong resale market during April, May, and June for No. 2 corn in Kansas, Oklahoma, and Texas. Johnson stated that it was his intent to deliver the corn for resale at those places and the plaintiff was aware of this fact. He further stated that his transportation costs to transport the grain were 8.7 cents per bushel. This was his absolute

cost and was figured on the basis of an average trip of 400 miles. His mileage was computed from Eustis where the corn was to be picked up. The testimony was undisputed that defendant could get 25 percent over the Atchinson, Kansas, market price in the Oklahoma-Texas area.

Five thousand bushels of the corn in the 40,000 bushel contract could be up to 17 percent moisture at no discount. The 5,000 bushels were sold by defendant to the Lincoln Grain, Inc., of Atchinson, Kansas. The 1,714 bushels were delivered to Yukon, Oklahoma, at the direction of Lincoln Grain. Defendant was surcharged $3,577 by Lincoln Grain for nondelivery of the remaining 3,286 bushels. Johnson testified that his lost profit on this part of the contract was the difference between the sale price of $1.66 per bushel and the contract price of $1.48 per bushel, less 8.7 cents transportation costs. Daily market prices for yellow corn at the Atchinson, Kansas, market from the period February 1 to July 2, 1973, were recieved in evidence. The market price for yellow corn at Atchinson, Kansas, on May 16, the date of the written cancellation of the contracts, was $1.76. Except for May 17, when it was $.01 less, it advanced steadily to $2.03 on May 31, and $2.08 on July 2.

By stipulation of the parties, a verdict of $2,348.56 was entered for plaintiff on its petition for the price of 1,714 bushels of wet corn. The jury returned a verdict for defendant in the amount of $19,172 on the counterclaim. The trial court, holding defendant did not introduce sufficient data to enable the jury to find the amount of damages with reasonable certainty and exactness, entered judgment notwithstanding the verdict for the plaintiff.

Under the Uniform Commercial Code, there are three general approaches used in assessing a buyer's damage where the seller has failed to deliver. The first is contained in section 2-712, U. C. C., titled "Cover; buyer's procurement of substitute goods." Here, the buyer made

attempts to cover, but was not successful. He is not barred from his other remedies by this failure, so section 2-712 is not applicable.

The second approach is found in section 2-713, U. C. C. That section reads as follows: "Buyer's damages for nondelivery or repudiation. (1) Subject to the provisions of this article with respect to proof of market price (section 2-723), the measure of damages for nondelivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this article (section 2-715), but less expenses saved in consequence of the seller's breach.

"(2) Market price is to be determined as of the place for tender or, in cases of rejection after arrival or revocation of acceptance, as of the place of arrival."

Under section 2-713, U.C.C., the measure of damages is the difference between the market price at Eustis, Nebraska, and the contract price, less expense saved in consequence of the breach. There is no evidence on the market price in the Eustis area. The evidence on market price was adduced for the Atchinson, Kansas, and the Oklahoma and northern Texas areas. Johnson did not attempt to show contract market differential damages, but instead sought only to recover consequential loss of profits under section 2-715, U.C.C. Lost profits cannot be proved under sections 2-712 or 2-713, U.C.C., but can be shown under section 2-715, U.C.C.

The third approach, which is the one used here, is found in section 2-715, U.C.C. While it has never been used heretofore in Nebraska, consequential damages are provided by the Uniform Commercial Code. This section provides: "Buyer's incidental and consequential damages. (1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable

charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

"(2) Consequential damages resulting from the seller's breach include

"(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

"(b) Injury to person or property proximately resulting from any breach of warranty."

Defendant on its counterclaim under section 2-715, U.C.C., adduced evidence that Johnson advised plaintiff as to where the corn was to be sold; that he was in the business of buying and selling grain; and that plaintiff was familiar with the nature of his business and understood he was purchasing the corn for resale in the Kansas, Oklahoma, and Texas markets. The case was tried on this theory. The jury, by its verdict, accepted defendant's theory.

To prove damages, defendant adduced evidence of its expected profit. It did this by showing there was a market at all times during the period for the corn. It adduced the price of corn at Atchinson, Kansas, for the period from February 1 to July 2, 1973. Lincoln Grain, Inc., which was reselling the corn for the defendant, was located at Atchinson, Kansas. Defendant also adduced the price over the same period for corn in the Yukon, Oklahoma, area where the corn was to be sold.

This is a case of first impression in Nebraska. White and Summers, who authored the Hornbook Series on the Uniform Commercial Code, state that most of the law regarding consequential damages can be traced back to the classic English case, Hadley v. Baxendale, 156 Eng. Rep. 145 (Ex. 1854). They quote the rule from Hadley v. Baxendale at page 314, as follows: "Where two parties have made a contract which one of them has broken, the damages which the other party ought

to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, i.e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it. Now, if the special circumstances under which the contract was actually made were communicated by the plaintiffs to the defendants, and thus known to both parties, the damages resulting from the breach of such a contract, which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a breach of contract under these special circumstances so known and communicated. But, on the other hand, if these special circumstances were wholly unknown to the party breaking the contract, he, at the most, could only be supposed to have had in his contemplation the amount of injury which would arise generally, and in the great multitude of cases not affected by any special circumstances, from such a breach of contract."

The courts had previously adopted two approaches to the question as to how much notice the breacher must have to hold him liable for consequential damages. In one, the seller must consciously assume the risk of consequent loss in case of his breach. In the other approach it was sufficient if the seller knew of the buyer's situation.

White & Summers, Uniform Commercial Code, Hornbook Series, § 10-4, page 316, cite the second approach as the recent trend of authority, and quote Professor Corbin in the following language: "All that is necessary, in order to charge the defendant with the particular loss, is that it is one that ordinarily follows the breach of such a contract in the usual course of events, or that reasonable men in the position of the parties would have foreseen as a probable result of breach."

The code draftsmen agreed with the latter test, and stated: " 'The "tacit agreement" test for the recovery of consequential damages is rejected.' " White & Summers, Uniform Commercial Code, Hornbook Series, § 10-4, p. 316.

This is the test submitted by the court in its instructions, which were as follows: "The only damages material in this case are 'consequential damages.' Consequential damages recoverable by the buyer are those that were reasonably foreseeable from his known needs that he could not meet or minimize. Specifically, consequential damages include any loss resulting from the general or particular requirements and needs of the buyer, of which the seller had reason to know at the time of contracting, and which could not be reasonably prevented by cover or in any other way.

"The buyer must attempt to minimize consequential damages in good faith, by cover or otherwise. He must use all reasonable means at his disposal to reduce the damages and is not entitled to recover damages which he could, with reasonable effort or expense, have avoided.

"Damages are determined at the time the buyer learned of the breach. It is for you to determine from all of the evidence when such event took place."

In Gulf Chemical & Metallurgical Corp. v. Sylvan Chemical Corp. (1973), 122 N. J. Super. 499, 300 A. 2d 878, affirmed 126 N. J. Super. 261, 314 A. 2d 73 (App. Div., 1973), that court found the seller liable for the non-delivery of two installments of a sales contract. In discussing the buyer's damages, the court stated that section 2-713 could not be applied since the buyer offered no proof of market price. The court went on to say that such failure did not preclude the buyer from suing for consequential damages. That court said: "Under section 2-715, consequential damages would be allowed in this case if the breaching seller at the time of contracting had reason to know that a resale was contem-

plated. But the section does not seem to permit speculative damages, and, consequently, expected profits are not allowed by it, unless they clearly would have been earned."

In Harbor Hill Lithographing Corp. v. Dittler Bros., Inc. (1973), 348 N. Y. S. 2d 920, 76 Misc. 2d 145, the court found that proof was lacking to show section 2-713 contract market differential damages but allowed lost profits under section 2-715. The court found the seller had reason to know of a contract of resale to a third party and so held it liable for lost profits under that contract. The court stated the possibility, if not the probability, of anticipated profit from resale was reasonably within the contemplation of the parties, and that there was no showing that the profits were extravagant. The court stated: "Dittler (seller) appears to rely mainly upon pre-UCC precedent which may have been more stringent in awarding lost profits, only where the 'special circumstance' of resale and its particulars were known in advance to the defaulting seller. See, e.g. Traction v. A & O Novelties Co., 32 Misc. 2d 991, 223 N. Y. S. 2d 565. However, the Code and commentary, effective in New York since 1964, make quite clear that resale circumstances put the seller on notice of potential exposure to liability for lost resale profits. There was ample proof that Dittler (seller) 'had reason to know' of Harbor Hill's (buyer's) particular requirements in obtaining and resale of the Barnell (resale buyer) brochures."

There was sufficient evidence from which the jury could conclude the plaintiff could reasonably have forseen the defendant would sustain consequential damages by plaintiff's breach of the contract. The evidence was sufficient to permit the jury to determine whether the seller had reason to know at the time of contracting that the defendant expected to sell the corn in Oklahoma and northern Texas where a market existed. Defendant adduced evidence that no corn was available in the

area because of the steadily rising price. The jury must have accepted the defendant's explanation and have found that it used all reasonable means at its disposal to mitigate its damages by cover, as required by the Uniform Commerical Code.

Plaintiff in its brief argues there is a lack of evidence as to matters of mitigation, such as profits earned by Johnson in custom hauling with his trucks during this period. Other than cover, on which proof is required by the Uniform Commercial Code, a litigant who asserts mitigation of damages in defense of a consequential damage action, has the burden of both pleading and establishing the mitigation. Adapted from Kring v. School District (1921), 105 Neb. 864, 182 N. W. 481, and Colton v. Benes (1964), 176 Neb. 483, 126 N. W. 2d 652.

Plaintiff also raises certain questions pertaining to the parol evidence rule and the statute of frauds in its brief. There is no cross-appeal herein, and consequently no assignments of error on these points. Even if relevant, they have not been properly presented for our consideration.

The trial court entered judgment notwithstanding the verdict for the plaintiff, on the theory defendant did not introduce sufficient data to enable the jury to find the amount of damages with reasonable certainty and exactness. The evidence covered the quantity of the corn involved, its acquisition costs, and its resale price on a date to be determined by the jury. The evidence also covered the costs actually saved because the corn was not delivered. The figure was fixed at 8.7 cents per bushel, which, of course, would be deducted from the sale price on the date determined by the jury. This was sufficient data to enable the jury to find the amount of damages with reasonable certainty. The judgment rendered on the counterclaim is within the range of the evidence. The trial court was in error in entering the judgment notwithstanding the verdict.

The judgment notwithstanding the verdict is reversed and the cause is remanded to the trial court with directions to reinstate the judgment on the counterclaim.

REVERSED AND REMANDED WITH DIRECTIONS.

BOSLAUGH, J., dissenting.

Under the Uniform Commercial Code the buyer's measure of damages for repudiation or nondelivery by the seller is the difference between the cost of cover and the contract price, or the difference between the market price and the contract price when the buyer learned of the breach, together with incidental and consequential damages, but less expenses saved. §§ 2-712, 2-713, U.C.C. In other words the buyer's damages are the loss of the bargain plus consequential damages, if any. Section 2-715, U.C.C., merely defines incidental and consequential damages.

To recover damages for the loss of the bargain it was incumbent upon the defendant to prove the cost of cover or the *market price at the place of tender* at the time when the buyer learned of the breach. § 2-713(2), U.C.C. The majority opinion concedes that the defendant buyer did neither.

The consequential damages which the defendant sought to recover was the *profit* the buyer would have made by resale in Kansas, Oklahoma, or Texas. A higher degree of proof is required to recover lost profits than is required for general damages. See K & R, Inc. v. Crete Storage Corp., 194 Neb. 138, 231 N. W. 2d 110. Even if it is assumed the defendant sustained consequential damages that could not have been prevented by purchase of other grain, the evidence here did not satisfy the requirements for proof of lost profits.

In my opinion the finding of the trial court that the defendant did not introduce sufficient data to enable the jury to find the amount of damages with reasonable certainty was correct. I would remand the cause for a new trial on the counterclaim on the issue of damages.