Jerry EICHENBERGER, Plaintiff
and Appellee,

v.

Jack WILHELM, Defendant
and Appellant.

Civ. No. 9201.

Supreme Court of North Dakota.

June 23, 1976.

Rehearing Denied Aug. 24, 1976.

Wheeler, Wolf, Wefald & Peterson, Bismarck, for defendant and appellant; argued by Albert A. Wolf, Bismarck.

Richard P. Rausch, Bismarck, for plaintiff and appellee; argued by Mr. Rausch.

ERICKSTAD, Chief Justice.

Plaintiff Jerry Eichenberger seeded a 97 acre field with spring wheat in May 1974. He had prepared the seed bed with a field cultivator that spring after harvesting wheat from the same field the previous fall. He had seeded eight to ten acres of the field when rain intervened; he completed the field apparently within four days.

On May 25, 1974, Eichenberger telephoned Jack Wilhelm who operates a ground and aerial spraying service. Eichenberger related that his field was heavily infested with wild oats and asked Wilhelm if he could spray the field. After Wilhelm indicated that he would be available, Eichenberger registered a concern that the only post-emergence herbicide available (Carbyne) would damage wheat which had emerged more than 14 days before the chemical application. Wilhelm declared that he had heard similar rumors but that he had encountered no such difficulties himself, and he suggested that Eichenberger call Ed Ferderer, a farmer who reportedly had sprayed Carbyne after the 14-day emergence period.

Ferderer declared that he had never had any problem because of late spraying, and Eichenberger called Wilhelm back, saying "Let's spray."

Eichenberger has been engaged in farming operations for several years. Wilhelm formerly worked in the control tower at the Bismarck airport and has been commercially engaged in ground and aerial spraying for 25 years. The two had contracted for spraying crops in previous years and also agreed that Wilhelm spray Eichenberger's crops for broadleaf weed control in 1974, which operation was accomplished sometime after the Carbyne application.

In a transcript replete with inconsistent and contradictory testimony, one series of events appears undisputed: Wilhelm sprayed the 97 acres on May 27, 1974, after retooling his aerial spraying system for application of Carbyne, and within the next few days, the wheat became discolored and limp. The field yielded an average of six bushels per acre, while Eichenberger's other fields averaged 16 bushels per acre. The evidence also established that control of the chemical and of its application rested solely with Wilhelm.

According to the testimony of a representative from Gulf Oil Company, which markets Carbyne, the chemical is a growth retardant material used to control wild oats. The chemical does not kill the wild oats plants but impedes the translocation of other material, including moisture and nutrients, through the plant. This retarding capability of Carbyne allows the crop to overtake the wild oats and ultimately reduces the relative demand of the wild oats on soil moisture and nutrients, which become available to the growing crop.

On its Carbyne labels and in its promotional literature, Gulf recommends applying not less than one-half nor more than one and one-half quarts of the chemical per acre in a mixture of five gallons of water. The primary factor used to determine when to apply the Carbyne is the leaf stage of the wild oats plant, subject to the admonition that the crop should not have emerged more than 14 days previous to the application. The former relates to susceptibility of the wild oat plant and the latter relates to potential damage to the crop plant. Chances of damage to the crop "become extremely high" after 14 days. Under normal conditions the effect of Carbyne on

wheat is that of delaying maturity, not reducing yield.

Wilhelm's issues on appeal may be grouped into two categories, the first relating to certain aspects of civil practice and the second relating to determination of damages.

The gravamen of Eichenberger's action is found in # 4 of his complaint, wherein he alleges

"that defendant carelessly, negligently and wrongfully applied a chemical upon the crop and lands leased by plaintiff and to such an extent that the plaintiff sustained damage in the sum of Four thousand Dollars ($4000.00) and by reason of crop loss occasioned by the application so made."

Wilhelm sought more specific information through pretrial discovery and during the trial. By interrogatory, he inquired of and received a response from Eichenberger as follows:

"8. INDICATE SPECIFICALLY THE ACTS OF THE DEFENDANT WHICH YOU DEEM WERE ACCOMPLISHED NEGLIGENTLY, CARELESSLY OR UNLAWFULLY AS ALLEGED IN YOUR COMPLAINT AND INDICATE WHAT CRITERIA, RULE OR REGULATION OR LAW WAS VIOLATED IN CONNECTION WITH SUCH ACTS.

"This is a civil action for damages. Plaintiff sustained damage as a result of the negligence of defendant and the same constituted a breach of contract. It is clear that defendant carelessly applied a chemical which caused the damage and any other response would be argumentative."

During the trial, counsel for Wilhelm again asked for greater specificity:

"MR. WOLF: I am asking for acts of the Defendant which constitute negligence, carelessness, or unlawful acts.

"THE COURT: I think you have covered it in your testimony but what do you think caused the damage? That's what they're asking you.

"THE WITNESS: I would say that possibly it could have been an overdose because of Mr. Wilhelm's statement, 'I think I should have only put it on half strength.'

"BY MR. WOLF:

"Q. Is that your only act or fact that you claim to be the basis for this lawsuit that he may have put an overdose in?

"A. In my mind, and I have discussed this with Jack, perhaps some nozzles were plugged and some nozzles gave out more liquid than others.

"Q. This is your assumption that this may have happened?

"A. Either one or the other I think could have happened.

"Q. Are you excluding in your determination as to the cause of the damage, if any, to this crop the fact that the crop was sprayed later than it should have been sprayed?

"A. I don't feel that that crop was sprayed later than it should have been sprayed.

"Q. So you are saying that you are excluding that as a fact or as an act or cause that would contribute to any damage, is that correct?

"THE COURT: Are you qualified to give that answer?

"THE WITNESS: I don't think so.

"THE COURT: By all the testimony that's preceded this, I don't believe he is qualified to answer that question either, Mr. Wolf, and the Court is going to overrule the question. He has indicated the only information he has on that point he received from either your client or a Mr. Ferderer that he called."

In his opinion from the bench, the trial judge made the following observations:

"The testimony . . . leaves little doubt in the Court's mind that the damage caused to this field was caused by the application of the Carbyne. * * *

   *     *     *     *     *     *

"Mr. Wilhelm's testimony . . . [and] the label of the Carbyne would seen to indicate that the majority of the crop

was at the stage where it could have been sprayed. * * * [T]hrough the use of his expertise, it's my belief that Mr. Wilhelm decided that he could spray.

" * * * [I]n this Court's opinion, as a distributor he [Mr. Wilhelm] is responsible for it [the spray] as a user or a person in the business. It seems to the Court that the composition of the spray is highly suspect in this case, but nonetheless, I think that Mr. Wilhelm, under the circumstances, has to bear the responsibility. Accordingly, I'd find liability."

Wilhelm's counsel pursued the matter further:

"MR. WOLF: * * * [I]s the Court finding that there is a warranty here?

"THE COURT: Yes. The general warranty that any dealer gives with his goods, yes, definitely, plus, in addition, it's this Court's opinion that spray was defective."

The trial court asked Eichenberger's attorney to prepare the findings of fact, conclusions of law, and order for judgment. Signed on September 17, 1975, the findings are a series of wide-ranging and lengthy recitals relating to Wilhelm's expertise, sole control of the chemical and its application, field inspection, and failure to warn; to Eichenberger's reliance on Wilhelm; and to the measure of damages. The conclusions of law simply entitle Eichenberger to recover $2,132.50 plus interest and costs and dismiss Wilhelm's allegation that Eichenberger had slandered his business reputation.

■ In *Warner v. Johnson,* 213 N.W.2d 895, 897 (N.D.1973), we noted that the purposes of requiring findings of fact in accordance with Rule 52(a), N.D.R.Civ.P., include affording the appellate court a clear understanding of the basis of the trial court's decision, making certain for purposes of estoppel and res judicata precisely what has been determined, and encouraging the trial judge to be careful in ascertaining the facts. We also referred to criticism of the practice of a trial court accepting findings prepared by the successful party, but found that the written findings of fact were sufficiently similar to the findings

contained in the trial court's oral opinion to warrant concluding that the court adequately and carefully considered the findings of fact. *Id.,* at 899.

In this case we believe the trial court carefully considered the facts. His opinion from the bench noted the absence of severe stress conditions, such as drought or improper seed bed preparation, on the crop. It included a determination "that the majority of the crop was at the stage where it could have been sprayed." It made no reference to the effect of plugged nozzles, which, if the condition had occurred, would have reduced the amount of chemical applied to the field. In short, the trial court excluded negligence as a basis for recovery. From our consideration of the record, we believe that conclusion is correct.

■ Only negligence, however, was alleged in the original complaint. Wilhelm attempted through his interrogatories to obtain more detailed information about the negligence alleged. Among the functions of discovery are "to obtain facts [and] to narrow and crystallize the issues before the court." *Roberson v. Great American Insurance Companies of N.Y.,* 48 F.R.D. 404, 414 (D.Ga.1969); *accord, Nutt v. Black Hills Stage Lines, Inc.,* 452 F.2d 480, 483 (8th Cir. 1971); 8 Wright & Miller, Federal Practice and Procedure: Civil § 2001 (1970).

The need for liberal discovery has emanated from the general nature of pleadings allowed by the Federal Rules of Civil Procedure, from which the North Dakota Rules are substantially drawn. Under this type of practice, "the pleadings are called upon only to give notice generally of the issues involved in the case." 8 Wright & Miller, Federal Practice and Procedure: Civil § 2001, at 14 (1970).

The notice provided for by the pleadings must be "sufficient to advise the other party of the event being sued upon, to provide some guidance as to what was decided for purposes of res judicata, and to indicate whether the case should be tried to the court or a jury." 5 Wright & Miller, Federal Practice and Procedure: Civil § 1202, at

60 (1969). In this case, we believe that the pleadings fairly apprised Wilhelm of the event being sued upon.

During the course of the trial, however, it became clear that Eichenberger had not proved negligence. The evidence indicated that the crop had not been sprayed too late and that the mixture was not too strong. Testimony that applications of too much Carbyne on test plots have not resulted in such immediate despoliation of wheat as occurred here corroborated the latter indication.

■ Whether the Carbyne was unmerchantable thus evolved as an issue. We have ruled that issues not raised in the pleadings but tried by the express or implied consent of the parties shall be treated as if they had been raised in the pleadings. *Askew v. Joachim Memorial Home,* 234 N.W.2d 226, Syllabus ¶ 6 at 229 (N.D.1975); *Frank v. Daimler-Benz, A. G., Stuttgart,* 226 N.W.2d 143, Syllabus ¶ 2 at 144 (N.D. 1975). By Rule 15(b), N.D.R.Civ.P., the pleadings may be amended to conform to the evidence "upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues."

■ The requirement that the opposing party consent expressly or impliedly to trying a new issue, or to meeting a different legal theory, reflects the desire to preclude prejudicing the other party in presenting his defense. 5 Wright & Miller, Federal Practice and Procedure: Civil § 1219, at 145 (1969). From our consideration of the record, we believe that Wilhelm was not harmed by being forced to confront a claim in warranty where the original pleadings sounded in negligence and that he impliedly consented to trying the issue of warranty.

By his own testimony relating to his decades of experience in aerial spraying, his licensing by state and federal authorities, and his training in the use of Carbyne, Wilhelm established himself as a "merchant," as defined in Section 41–02–04 (2–104), N.D.C.C. A "merchant" is one "who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practice or goods involved in the transaction * * *."

Evidence at trial also indicated that Wilhelm exercised sole control over the Carbyne, its mixture with water, and its application. The crop was apparently in such a condition, in terms of both leaf stage and time since emergence, that it was not unusually susceptible to damage from Carbyne. As we have previously noted, even unusually strong concentrations of Carbyne applied to test plots do not affect wheat in as immediate a manner as Eichenberger's crop was affected.

Additionally, there were narrow strips from three to five feet wide and spaced 30 to 40 feet apart that did not appear damaged. By the time the wheat had headed out the narrow strips "had progressed and the in-between stuff just wasn't making it."

Eichenberger adequately proved that the defect existed at the time the Carbyne was applied. In other words, he met his "burden of proving that the goods were nonmerchantable and that this condition existed at the time when the goods were delivered to him." 1 Anderson, Uniform Commercial Code § 2–314:31, at 552 (2d ed. 1970).

■ The exclusion of negligence in mixing the Carbyne or in applying it to the wheat after it had become highly susceptible to the Carbyne, plus the narrow strips of better wheat spaced 30 to 40 feet apart, meets the requirement that the plaintiff in a warranty action prove "that the unsatisfactory results obtained in using the seller's goods were the result of a condition of or defect in the goods which was a breach of warranty * * *." 1 Anderson, Uniform Commercial Code § 2–314:31, at 552 (2d ed. 1970).

■ Unlike warranty of fitness for a particular purpose, Section 41–02–32 (2–315), N.D.C.C., the implied warranty of merchantability does not require reliance by the buyer on the seller's skill and judgment. See *Northern Plumbing Supply, Inc. v. Gates,* 196 N.W.2d 70 (N.D.1972), for a dis-

cussion of the elements of warranty of fitness for a particular purpose.

■ We believe, therefore, that Eichenberger has proved the existence of his claim for relief under Section 41–02–31(2–314), N.D.C.C., by showing that Wilhelm was a merchant as to the goods involved, that the Carbyne was defective when applied by Wilhelm under his sole control to the wheat, and that the defect was the efficient cause of the damage to the crop.

■ While the Carbyne label excludes any warranties beyond the statement that "this material conforms to the chemical description on the label and is reasonably fit for use as directed hereon" and includes a statement that the buyer assumes all risks and liabilities except those assumed by Gulf, the evidence in this case establishes that Eichenberger was not shown the label. Where the buyer is given no opportunity to see and read the label, this court will not elevate the disclaimer to status as a part of the bargain. Since Eichenberger did not read the label, we also agree with the trial court's finding that he did not assume the risk that his wheat crop would be substantially and permanently damaged.

■ We note, incidentally, that this claim might also be sustained on grounds of strict liability in tort. *See Johnson v. American Motors Corporation,* 225 N.W.2d 57 (N.D.1974). We also advise that complaints in the future make clearer reference to the alternate theories of negligence, warranty, and strict liability, where the claim for relief may be predicated upon one or more of these theories. Such reference alerts the opposing party to the nature and sequence of evidence to be presented and allows the trial court to better categorize its findings. In turn, as an appellate court, we will be presented with more orderly, less scattered findings.

■ Wilhelm also asserts that the determination of damages was incorrect in that there was no evidence of the value of the crop before it was sprayed. He accepts the standard that

"* * * the measure of damages for injury to or partial destruction of a growing crop is the difference between the value of the crop immediately before and its value immediately after the injury or partial destruction. The most generally approved method of ascertaining damages for such crop injuries is to take the value at maturity which the probable crop would have had but for the injury, deduct the value which the injured crop actually had at maturity, and deduct further any reduction in amount and value of labor and expense attributable to the reduced yield. See 21 Am.Jur.2d, Crops, sections 78–79. 25 C.J.S. Damages § 85b is to the same effect. See authorities collected in these two encyclopedias." *Martin v. Jaekel,* 188 N.W.2d 331, 336 (Iowa 1971).

More specifically, he avers that Eichenberger made no attempt "to ascertain the value of the crop at the time of its destruction or its expected yield at that time under those conditions [including the wild oats infestation]." In *Reeder Flying Service v. Crompton,* 470 P.2d 281 (Wyo.1970), the court affirmed an award of damages based upon diminution in value of lands but modified the judgment to exclude any award for value of crops damaged or destroyed. There, 22 acres of alfalfa had been damaged when emergency forced a pilot to jettison 2, 4–D, and, while the alfalfa was within two weeks of its first cutting, the only estimates given were for the yield of both the first and second cuttings.

The Wyoming court noted that the objective in awarding damages is to compensate for losses and that while such damages "may not always be calculated with absolute certainty, [they] must be susceptible of ascertainment with a reasonable degree of certainty." *Id.* at 286.

In this case, Eichenberger testified that the field yielded an average of six bushels per acre and that he harvested it himself with his own combine. His other fields averaged 16 bushes per acre. A neighbor's field just south of Eichenberger's damaged field averaged 24 bushels per acre. Two

individuals who rented the east half of the section that included the damaged crop also harvested a crop that averaged 16 bushels per acre.

In his memorandum opinion the trial court noted that "if there was a larger crop, there would have been a certainly larger cost factor." He also alluded to the "question of hauling." As to loss suffered by Eichenberger, he determined that Eichenberger lost seven bushels per acre at $5.00 per bushel for a total of $3,395. As set-offs he allowed Wilhelm $826 for spraying 413 acres of wheat for broadleaf weeds and $436.50 for applying the Carbyne.

In establishing the yield loss, the trial court assumed that the Carbyne application would have been successful. He declared that "we know his crop average, we know the average in the immediate vicinity, and that is how the Court has arrived at its conclusion." He further explained that he reduced the yield loss to seven bushels per acre because of "[s]ome additional costs on [Eichenberger's] part and perhaps a little less yield."

We believe that the trial court did not err as a matter of law in assuming that the Carbyne application would have been successful. Control of the wild oats was the objective of the transaction. The trial court via set-off allowed Wilhelm to recover his fee for spraying the Carbyne. Eichenberger testified that there was some wild oats in the crop at harvest, while a representative from Gulf indicated that wild oats control on the field appeared good. The trial court's assumption and set-off appear consistent with the desire of the law to place the injured party in the position he would have occupied had the damage not occurred. See Section 41-01-06(1-106), N.D.C.C.

Considering the trial court's appreciation of the decreased cost of harvesting and hauling and of Eichenberger's reduced yield, the negligibility of the former in this case and the uncertainty of the latter, we do not believe that a remand would serve any purpose in this case.

The judgment of the District Court is, therefore, affirmed for the reasons stated in this opinion.

SAND, PAULSON, PEDERSON and VOGEL, JJ., concur.