Dean CLAIRMONT, d.b.a. Classic Automobiles of Bismarck, Ltd., and Classic Automobiles of Bismarck, Ltd., Plaintiffs and Appellants,

v.

STATE BANK OF BURLEIGH COUNTY TRUST COMPANY, Defendant, Third-Party Plaintiff and Appellee,

v.

John IGOE, Third-Party Defendant and Appellee.

Civ. No. 9752.

Supreme Court of North Dakota.

July 22, 1980.

Lundberg, Conmy, Nodland, Rosenberg, Lucas & Schulz, Bismarck, for plaintiffs and appellants; argued by Patrick A. Conmy, Bismarck.

Wheeler, Wolf, Wefald, Peterson & McDonald, Bismarck, for defendant, third-party plaintiff and appellee; argued by David L. Peterson, Bismarck.

SAND, Justice.

Dean Clairmont, d. b. a. Classic Automobiles of Bismarck, Ltd., appealed from the judgment of the Burleigh County district court which dismissed his complaint against the State Bank of Burleigh County Trust Co. for tortious conversion of personal property and business libel.

During the summer of 1978 Clairmont organized Classic Automobiles of Bismarck, Ltd., for the purpose of buying and selling "investment automobiles," which by their rarity or classic nature will likely increase in value rather than depreciate. Clairmont opened a checking account in the corporate name at the State Bank of Burleigh County Trust Co. and personally executed a printed form signature card.

Thereafter, Clairmont agreed to accept a custom patterned Excalibur automobile "on consignment" from one Dr. Neville Jones and his son, Barrie Jones. Clairmont was to arrange a sale of the Excalibur through his business and, in return, retain a $500 commission from the purchase money.

Clairmont soon thereafter contacted John Igoe, who was willing to purchase the Excalibur for $25,000 provided he could secure financing. Clairmont then accompanied Igoe to the State Bank of Burleigh County where Igoe applied for a loan with which to purchase the automobile. Igoe proposed to secure the $25,000 note with eight automobiles, including the Excalibur and a 1973 Jaguar. Because Igoe at that time did not have an account at the State Bank of Burleigh County, the procedure which was to be followed if the loan was approved was that the bank would deposit the $25,000 loan proceeds directly into the Classic Automobiles of Bismarck, Ltd., account. Clairmont would then issue a check to Barrie Jones for the Excalibur, the title to the car would be delivered to the bank, and Igoe would receive the car. This procedure was known and agreed to by all parties, including the bank through its loan officer, Timothy Hennessy. The loan was subsequently approved by the State Bank of Burleigh County.

On 1 Aug. 1978 a promissory note for $25,000 and a financing statement giving the State Bank of Burleigh County a security interest in eight motor vehicles was signed by John Igoe and his wife. The following day, 2 Aug. 1978, the proceeds from the Igoe loan were deposited in the Classic Automobiles of Bismarck, Ltd., account by the bank and loan officer Hennessy called Clairmont and told him that the money had been deposited and that Clairmont could "go ahead and pay for the car." Clairmont on the same day, 2 Aug. 1978, gave Barrie Jones a check, dated 26 July 1978, in the amount of $24,500 in payment for the Excalibur. Because the loan proceeds were then deposited in Clairmont's account, the transaction was proceeding smoothly as planned.

On 3 Aug. 1978, James Igoe, John's brother, notified the State Bank of Burleigh County that John was deeply in debt to James, and that any financial statement given to the bank by John was false and fraudulent. Upon receipt of this information from James Igoe the bank contacted the credit union which corroborated that information but otherwise the truth of the matter was not thoroughly discussed in the record. The State Bank of Burleigh County then "rescinded" the Igoe loan, and withdrew the $25,000 proceeds thereof from the account of Clairmont. When Clairmont's check to Barrie Jones was presented at the bank it was marked "refer to maker" and returned unpaid. The bank claims it attempted to contact Clairmont immediately upon learning of the situation but was unable to reach him by telephone. By the time Clairmont was contacted the bank had already made the reversal entry. It was not clear from the record exactly when Clairmont was notified of the bank's "reversing order," but he became aware of his dilemma within a few days subsequent to the bank's actions.

Sometime later in August of 1978, Barrie Jones, in the company of his father and their attorney, re-presented the check for payment at the State Bank of Burleigh County, and a notation "not sufficient funds" was endorsed upon the check by the bank. Dr. Neville Jones and Barrie Jones initiated a lawsuit against Clairmont and Classic Automobiles of Bismarck, Ltd., for damages incurred by them in the aborted sale of the Excalibur. However, this action was later dismissed by the Burleigh County district court and is not pending at this time.

On 13 Sept. 1978 Clairmont commenced the present action against the State Bank of Burleigh County. His complaint alleged that the unauthorized removal by the bank of the $25,000 Igoe loan proceeds from Clairmont's account constituted an intentional business libel and a tortious conversion of personal property. Clairmont sought compensatory damages in a total amount of $35,000 and punitive damages in a total amount of $105,000 on the two claims, along with expenses incurred in pursuit of his property. The case was tried before the Burleigh County district court on 25 Sept. 1979.

On 2 Oct. 1979, the district court issued a memorandum opinion concluding that Clairmont's claim against the bank be dismissed. The district court determined that the facts of the case failed to establish that any business libel or damages to business reputation had taken place. Further, the court concluded that the $25,000 deposit to Clairmont's account represented a trust on behalf of Igoe and that therefore Clairmont was never the owner of the funds. Consequently, the district court determined that no conversion took place. Judgment was entered against Clairmont consistent with the district court's memorandum opinion, and Clairmont appealed to this court from the judgment.

In *Christensen v. Farmers State Bank of Richardton*, 157 N.W.2d 352 (N.D.1968), the North Dakota Supreme Court defined conversion as follows:

"Conversion consists of a positive tortious act, a tortious detention of personal property from the owner, or its destruction, or a wrongful exercise of dominion over the property inconsistent with, or in defiance of, the rights of the owner. [Citations omitted.] The gist of a conversion is not in acquiring the complainant's property, but in wrongfully depriving him of it, whether temporarily or permanently, and it is of little relevance that the converter received no benefit from such deprivation. [Citations omitted.]" 157 N.W.2d at 357.

See also, *Dairy Department v. Harvey Cheese, Inc.*, 278 N.W.2d 137 (N.D.1979); and *Brunswick Corporation v. Haerter*, 182 N.W.2d 852 (N.D.1971). In the instant case, Clairmont alleged that the bank's withdrawal of the Igoe loan proceeds from his account constituted an intentional conversion of his personal property.

The relationship between a bank and its depositors in this state has undergone some changes, and since 1914 has come almost

full circle. In *Shuman v. Citizens' State Bank of Rugby*, 27 N.D. 599, 147 N.W. 388 (1914), this Court recognized the rule of law that a bank may apply general deposit money to the payment of an antecedent debt of a depositor even though the money is in fact trust money, provided the bank is without knowledge of the trust and the application to the debt is consented to by the trustees or depositor.

Subsequent to the *Shuman* decision, the North Dakota Legislature, by Ch. 139 of the 1923 Session Laws, enacted what is now § 6–03–67, NDCC. This section in essence states that except for § 30.1–31–13, NDCC, it is unlawful for any banking institution to charge any claim against the deposit with the association or to appropriate a deposit or any part thereof to the payment of a debt to the association without legal process or the specific consent of the depositor.

Section 6–03–67, NDCC, was construed in *First International Bank v. Brehmer*, 56 N.D. 81, 215 N.W. 918 (1927), to mean that a bank could not under the garnishment statutes of the state summon or charge itself as a garnishee in such action. Later, this Court, in *Biby v. Union National Bank of Minot*, 162 N.W.2d 379 (N.D.1968), held in effect that the signature card constituted a contract between the depositor and the bank and that the provisions of the signature card controlled even though the part authorizing withdrawal, etc., is in smaller print than the other part of the card. The Court also held that the signing of a signature card in ignorance constitutes no defense to the agreement contained in the signature card in the absence of fraud or artifice. On a related topic and discussion see 8 A.L.R.3d *Banks—Application of Deposits*, p. 246, et seq.

■ When Clairmont initially opened the Classic Automobiles of Bismarck, Ltd., account at the State Bank of Burleigh County, he personally signed a signature card which provided in relevant part as follows:

"The Depositor hereby authorizes the Bank, *at anytime it deems itself insecure*, or in case of the death or insolvency of the depositor, to charge or setoff any deposit of the depositor with the Bank any debts or obligations owing by the depositor to the Bank whether *direct or indirect*, secured or unsecured, absolute or contingent, joint or several, due or to become due, whether on maker, endorser, guarantor, or otherwise, now existing or hereafter contracted or acquired by the Bank and whereever payable, and the interest thereon and expense, if any, which may be incurred by the Bank in connection therewith, and *this agreement shall be construed to be the consent of the depositor to make such a charge or setoff against his/her/their account(s) if consent be required by any present or future statute or law*." [Emphasis added.]

After the State Bank of Burleigh County learned that the titles to the vehicles given by Igoe to secure the $25,000 Excalibur loan were encumbered, it justifiably deemed itself *insecure* particularly as to Igoe's financial ability to repay the note as it became due. Further, because Clairmont played a large personal role in the entire transaction between the bank and Igoe, and in making the deposit in Clairmont's account, we believe the bank properly considered Clairmont a trustee for Igoe at least to the extent of the Igoe loan proceeds which were in his account. Under these facts, the signature card signed by Clairmont authorized the bank to "charge or setoff" this indirect obligation against Clairmont's account. Thus, the signature card contract between Clairmont and the bank constituted Clairmont's consent to the bank's action. Because the bank was authorized to withdraw the funds from Clairmont's account, there was no conversion in this case.

■ Section 41–04–29, NDCC (§ 4–402 of the Uniform Commercial Code) provides that a payor bank is liable to its customer for damages caused by the wrongful dishonor of an item. The official comment to the Uniform Commercial Code explained that this section rejected the theory that where the dishonored item was drawn by a merchant, trader or fiduciary, he was de-

famed in his business, trade, or profession on a damages "per se" basis. The merchant, trader, or fiduciary is placed on the same footing as any other drawer and in all cases of dishonor by mistake, damages recoverable are limited to those actually proved. See, Official Comment, Uniform Commercial Code § 4–402. The district court in this case dismissed the business libel portion of Clairmont's complaint because no damages to Clairmont's business reputation were shown at trial to have been caused by the bank's dishonor of Clairmont's check to Barrie Jones.

■ Clairmont asserted in a post-trial memorandum to the district court and again to us on appeal that he incurred over $2400 in legal expenses directly attributable to the bank's actions and also lost $500 in "commission" because of the cancelled sale of the Excalibur to Igoe. The trial transcript submitted on appeal contained no evidence, and Clairmont asserted none at oral argument, of any further detrimental publicity or loss of future sales as the result of the State Bank of Burleigh County's dishonor of Clairmont's check to Barrie Jones. The State Bank of Burleigh County, however, is not liable to Clairmont for his legal expenses and the $500 "commission" under § 41–04–29, NDCC, unless the bank's dishonor was wrongful. As was pointed out above, the State Bank of Burleigh County was authorized to withdraw the Igoe loan proceeds from Clairmont's account because of the contractual provisions in the signature card which Clairmont personally signed. Therefore, because the withdrawal was authorized, the bank acted properly in dishonoring the $24,500 check because there were insufficient funds in the Clairmont account at the time payment was sought. We agree with the trial court in dismissing the complaint.

Lest this opinion be construed to mean that the bank is legally supported in every phase of its action, we deem it advisable to discuss briefly another phase relating to torts.

■ Generally, to constitute a tort either a legal right or duty imposed by law in favor of the party injured must have existed which was breached. Conduct, even though improper, does not always constitute a tort unless a legal right, as distinguished from a moral right, was violated or a duty was disregarded. *St. Paul Fire and Marine Insurance Company v. Amerada Hess Corporation*, 275 N.W.2d 304 (N.D. 1979), and 86 C.J.S. *Torts* §§ 6, 7, 8 and 9, p. 926 et seq. However, a person may voluntarily perform an affirmative act and may thereby assume a legal duty that will afford a basis for tort liability. *Pirocchi v. Liberty Mutual Insurance Co.*, 365 F.Supp. 277 (D.C.1973). In such case the standard of reasonable care applies. See Prosser, *Handbook of Law and Torts* (4th ed. 1971), § 56.

The bank had no legal duty or obligation to inform Clairmont by telephone that a deposit in his account was made, but having undertaken to do this the bank arguably may have assumed an obligation for which it may be held legally liable if it was reasonably understood that the party to whom the information was given would depend or rely upon it and act accordingly.

The record does not contain any evidence what measures, if any, the bank took at the time the loan was negotiated with Igoe to determine his financial condition. Neither does the record disclose what affirmative statements were made by Igoe, etc. Igoe, in the execution of an instrument, purportedly gave as security for the loan a number of vehicles. The bank may have had reason to believe the security furnished by Igoe was proper and adequate. However, the bank afterwards was informed otherwise, which prompted further inquiry. As soon as the bank learned from the credit union officer that the vehicles given as security by Igoe were encumbered and were of doubtful financial value to the bank it attempted to contact Clairmont but was unable to reach him because Clairmont was at a place where telephone connections were not present.

■ This principle of law, however, is not ripe for our appellate determination on the

record made and submitted. The complaint basically rested on "business libel" and "tortious conversion." We recognize that strict pleading is no longer required and that a cause of action can be changed or modified either by amendment of the complaint or pleadings or by consent of the parties or by the actual trial of the subject matter. *Eichenberger v. Wilhelm*, 244 N.W.2d 691 (N.D.1976); *Askew v. Joachim Memorial Home*, 234 N.W.2d 226 (N.D.1975). In the latter instance, the common practice is to move that the pleadings be amended to conform to the material submitted at the trial. Rule 15(b), N.D.R.Civ.P. Furthermore, the parties on appeal briefed the theory of tortious conversion and orally confined the arguments basically to that concept. The theory that Clairmont relied or depended upon information received from the bank and was thereby damaged was not specifically argued or presented to the trial court or to this Court.

Clairmont presented an unsworn statement to the court regarding attorney fees incurred as a result of this lawsuit. The statement also contained other references to attorney fees resulting from an action instituted against Clairmont by Jones for failure to complete the sale, etc. However, the reference to the attorney fees arising out of the *Jones v. Clairmont* action contained a notation "strike" which meant that these fees were not to be included in this action. The parties to this action in a sense

* Garaas, District Judge, sitting in place of Paulson, J., disqualified.

agreed that the question of attorney fees for this case could be submitted ex parte to the court.

We have no indication what the situation would have been if the issue of attorney fees would have included the attorney fees resulting from the action by *Jones v. Clairmont*. Consequently, it would be inappropriate for us to attempt to resolve this concept or principle of law on the meager presentation that has been made. We are not suggesting that Clairmont would prevail in the event an action embracing such concepts were initiated. The pertinent facts relating to the transaction, including such items touched upon earlier herein, would have to be established, as well as principles of law pertinent to this concept. The record does not contain sufficient facts to resolve the issues which would be involved.

Costs assessed to neither party.

ERICKSTAD, C. J., VANDE WALLE and PEDERSON, JJ., and GARAAS, District Judge,* concur.