GUARANTEED FOODS OF NEBRASKA, INC.,
A CORPORATION, APPELLEE, V.
RAYMOND E. RISON AND GERTRUDE RISON,
HUSBAND AND WIFE, APPELLANTS.

299 N.W.2d 507

Filed December 5, 1980. No. 42960.

John R. Brogan of Brogan, McCluskey & Wolstenholm for appellants.

Kenneth R. Lang of Angle & Lang for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

BRODKEY, J.

Guaranteed Foods of Nebraska, Inc., plaintiff and appellee herein, brought this action in the county court of York County to recover the sum of $1,052.52, which it alleged represented the balance due it under two installment contracts entered into between it and the appellants-defendants, Raymond and Gertrude Rison, husband and wife. The first cause of action in the petition involved a contract for the purchase of a membership in Guaranteed Foods permitting the defendants to purchase food and other nonfood items, including appliances. The second cause of action in plaintiff's petition involved the balance allegedly due on a contract with plaintiff for the purchase of food products, which were subsequently delivered and allegedly consumed by the defendants.

The facts relevant to this appeal, as revealed in the record, indicate that on February 7, 1977, a representative of Guaranteed Foods arrived at the home of the defendants pursuant to a prearranged appointment. The ensuing interview, which lasted approximately 2½ hours that evening, was continued the following night, February 8, 1977, at which time available food purchase plans were discussed. Testimony in the record reveals that, in presenting the food plans to the Risons, the representative of Guaranteed Foods informed the defendants that they would enjoy long term savings of $4,000 over a 10-year period which would amount to a savings on their food bills of approximately 25 percent. However, it was later admitted by counsel for plaintiff at oral argument of this matter before this court that the potential sav-

ings to the defendants amounted to approximately $2.32 per week. Although plaintiff's membership program included the right to purchase nonfood items such as appliances, furniture, and other merchandise at a "membership discount," the defendants did not purchase a food freezer for the reason that they already owned one.

It further appears from the record that when the Risons purchased their membership on February 8, 1977, they executed an installment sales contract for $850 representing the cost of the membership. However, added to this base amount, as set out in the contract, were finance charges, charges for life insurance, and sales tax, making the total amount due under the contract $1,194.96. The contract also shows that the Risons made a downpayment at that time of $30 to apply against the membership costs, and the contract provided that the balance due thereunder should be paid in 35 monthly installments of $32.36, together with interest thereon at the rate of 18 percent per annum. Shortly after entering into their membership agreement with the plaintiff, the defendants, on February 10, 1977, placed a grocery order for food products, which were delivered to them on February 16, 1977. Upon the delivery of the grocery items on that date, the defendant Raymond E. Rison, executed an additional installment sales contract for $582.16 which, with the finance charge added thereto, amounts to the sum of $608.60, to be paid in five equal monthly installments of $121.72 each on the 18th day of each month beginning March 18, 1977.

Shortly thereafter, after further consideration of the matter, the Risons became disenchanted with their membership contract and the quality of the food products delivered to them, and attempted to cancel their membership pursuant to the terms of the contracts entered into by them. The record reveals that on Sunday, February 20, 1977, the Risons drove to Grand Island, Nebraska, and Raymond Rison deposited

a letter signed by him under the door of the place of business of Guaranteed Foods, notifying it of his intent to cancel the membership agreement, as well as the contract for the food products, and demanding a return of the $30 downpayment. It is clear that Guaranteed Foods received the letter, as on the following evening, Monday, February 21, 1977, the president of Guaranteed Foods telephoned the Risons inquiring as to the reason for their cancellation. The record indicates that, in that telephone conversation, the president urged the defendants to continue with the program, and the Risons agreed at that time to "give it a try." During the following 4 months, the defendants consumed many of the food products they had purchased and also made payments on both contracts totaling the sum of $593.96. However, on July 13, 1977, the Risons notified Guaranteed Foods, and its assignees of the contracts, that no further payments would be made as they were not obligated to Guaranteed Foods.

The action came on for trial before the judge of the county court of York County, sitting without a jury, on February 8, 1979. In its decree, the court found in favor of the defendants and against the plaintiff on the first cause of action involving the membership agreement and dismissed that cause of action. In so doing, the court also found that the notice of cancellation given by Rison to Guaranteed Foods was valid and that the membership contract between Guaranteed Foods and the Risons was void (without specifying the reason for doing so). As to the second cause of action, involving the contract for the purchase of food products, the court found that the defendants received and used the food, and entered judgment against the defendants in the amount of $111.32 plus a reasonable attorney fee and court costs. On appeal, the District Court for York County, in a trial de novo on the record, reversed the holding of the trial court with reference to the membership agreement, finding that

the agreement had been performed through May 1977, a period of 4 months after the execution of the contract and also found that the defendants failed to prove by a preponderance of the evidence the cancellation of the agreement pursuant to its terms. The court found that the defendants were indebted to the plaintiff on the first cause of action in the sum of $941.20, which included interest at 18 percent per annum through February 23, 1980, and entered judgment to that effect. With regard to the second cause of action, the District Court found that the plaintiff had fully performed its contract for the purchase of food and grocery products and that there remained due and owing the plaintiff from the defendants the sum of $111.32, and affirmed the judgment of the county court on that cause of action.

The Risons thereafter perfected their appeal to this court. In their brief, their principal assignments of error, which they claim justify reversal of the judgment of the District Court, are that the court erred: (1) In failing to find that the enforcement of the installment contract for payment of the membership agreement produced an unconscionable result contrary to the provisions of Neb. U.C.C. § 2-302 (Reissue 1971); and (2) In failing to find that the Risons had effectively cancelled the membership agreement and both installment contracts in compliance with the cancellation provisions set forth in all of said contracts. They also allege that the court erred in awarding attorney fees to Guaranteed Foods in the sum of $300. We shall discuss these issues in the order they are presented above.

Discussing first the claim of the defendants that the court erred in not finding the contracts to be "unconscionable" § 2-302, some background will be helpful. Prior to the adoption of the Uniform Commercial Code in 1963, the general view was that parties were bound by the agreements they entered into, and the fact that the bargain was a hard one was held not

to entitle a party to be relieved therefrom if he had assumed it fairly and voluntarily. 67 Am. Jur. 2d *Sales* § 116 (1973). However, in 1963, Nebraska adopted the Uniform Commercial Code, which provides, in § 2-302:

"(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

"(2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination."

67 Am. Jur. 2d *Sales* § 116 at 232, summarizes the changes made by the Uniform Commercial Code with reference to "unconscionable contracts" as follows: "The Uniform Commercial Code directly permits a court to hold a contract or term thereof unenforceable, or limited in its application by reason of being 'unconscionable.' The Code provides that if a court finds as a matter of law that a sales contract or any clause thereof is 'unconscionable' at the time it was made, the court may refuse to enforce the contract as a whole or any clause found unconscionable, or the court may limit the effect of such clause in order to avoid any 'unconscionable result.' The Code also provides that the parties have the right to present evidence as to the commercial setting, purpose, and effect of any allegedly unconscionable contract to aid the court in determining the question of unconscionability."

To the present date, we have found no Nebraska cases, nor have we been cited any by the parties to this appeal, which have applied or interpreted § 2-302, and

it appears that we will be unable to do so in this case for several reasons.

It is clear from a perusal of Neb. U.C.C. § 2-102 (Reissue 1971) that article 2 of the Code is intended to apply only to transactions in goods. That section provides: "Unless the context otherwise requires, this article applies to *transactions in goods;* it does not apply to any transaction which although in the form of an unconditional contract to sell or present sale is intended to operate only as a security transaction nor does this article impair or repeal any statute regulating sales to consumers, farmers or other specified classes of buyers." (Emphasis supplied.) Neb. U.C.C. § 2-105 (Reissue 1971) defines the term "goods," as used in article 2, as follows: "'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (article 8) and things in action. 'Goods' also includes the unborn of young animals and growing crops and other identified things attached to realty as described in the section on goods to be severed from realty (section 2-107)." The definition of "goods," as used in article 2, stresses the element of "movability" of the item in question.

It is clear from the above definition that the groceries and food products covered by the second contract would clearly fall within the definition of "goods," and be governed by the provisions of the Uniform Commercial Code. The same, however, cannot be said with reference to the membership contract, and we have discovered no cases which have specifically passed upon this question. Under the above definition of "goods," however, it would seem to be highly questionable whether such a contract would be considered as "goods" and subject to the provisions of the Uniform Commercial Code. However, even assuming *arguendo* that the membership contract in question permitting the purchase of food and also nonfood items including

appliances and furniture would constitute "goods" and be subject to the provisions of the Uniform Commercial Code, we are precluded from considering the issue of unconscionability under § 2-302 of the Code in the instant case, for the reason that the issue was neither raised nor litigated as a defense in the trial court, and hence can be neither urged nor considered for the first time on appeal to the Supreme Court. A review of the record in this case discloses that the issue of unconscionability was raised by the Risons for the first time in their brief to this court. Nothing appears in their amended answer alleging unconscionability as a defense. It is a well-established rule in this jurisdiction that defenses not raised or litigated in the trial court cannot be urged for the first time on appeal. *Smith v. Wrehe*, 199 Neb. 753, 261 N.W.2d 620 (1978). See, also, *Meyer v. Meyer*, 180 Neb. 379, 142 N.W.2d 922 (1966).

We are also of the opinion that the issue of unconscionability must be pleaded in order to be considered by the court. While there is a dearth of authority on this question, there are cases indicating that such issue is required to be pleaded, rather than being considered by the court *sua sponte*. In *Patterson v. Walker-Thomas Furniture Co.*, 277 A.2d 111, 114, 9 U.C.C. Rep. 27, 31 (D.C. Ct. App. 1971), it is stated: "An unsupported conclusory allegation in the answer that a contract is unenforceable as unconscionable is not enough. Sufficient facts surrounding the 'commercial setting, purpose and effect' of a contract at the time it was made should be alleged so that the court may form a judgment as to the existence of a valid claim of unconscionability and the extent to which discovery of evidence to support that claim should be allowed." The above quotation from *Patterson* was cited with approval in *Morris v. Capitol Furniture & Appliance Co.*, 280 A.2d 775, 9 U.C.C. Rep. 577 (D.C. Ct. App. 1971). White & Summers, Uniform Commercial Code (2d ed. 1980), concedes that there is authority for the

proposition that the defendant must plead the issue of unconscionability as an affirmative defense, although they indicate that U.C.C. § 2-302(1) would seem to permit a court to raise the issue *sua sponte*. On page 150 of the above treatise it is stated: "At least one court has said that the defendant must plead the issue [of unconscionability] as an affirmative defense. Yet the words of 2-302(1) seem to permit a court to raise the issue *sua sponte*." They add: "Furthermore, the party raising the issue has the burden of proof, at least according to some courts, and must show that the contract or clause was unconscionable at the time of contracting." The evidence in the record does not indicate that the Risons either pleaded the issue of unconscionability in their amended answer nor sustained their burden of proof by evidence at the trial. While we would not be hesitant to meet the issue of unconscionability squarely were it properly presented to us, we are unable to do so in this case.

We now discuss the issue of whether the Risons effectively cancelled their contracts under the terms thereof relating to cancellation on their visit to the offices of the company on Sunday, February 20, 1977. A perusal of the Membership Sales Agreement executed by the parties indicates that there are conflicting provisions contained therein with reference to the buyer's right to cancel. The first said provision reads as follows: "Should the family named in this agreement find that Guaranteed Foods service has been misrepresented in any way, this agreement may be cancelled by notifying the home office of Guaranteed Foods, Inc., in writing within 72 hours from the delivery date of the original food order." Also printed in capital letters at the bottom of the membership agreement is the following language: "YOU THE BUYER, MAY CANCEL THIS TRANSACTION AT ANY TIME PRIOR TO MIDNIGHT OF THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION. SEE THE ATTACHED NOTICE

OF CANCELLATION FORM FOR AN EXPLANA-TION OF THIS RIGHT." The Membership Sales Agreement received in evidence as exhibit 4 does not, however, have attached to it the notice of cancellation referred to. However, the installment sales contract received in evidence as exhibit 3 has printed upon it the following:

"BUYER'S RIGHT TO CANCEL

"You may cancel this agreement by mailing a written notice to Guaranteed Foods of Hastings and Grand Island, Inc. 2316 South Locust Grand Island, NE 68801 before midnight of the third business day after you signed this agreement. If you wish, you may use this page as that notice by writing 'I hereby cancel' and adding your name and address." The installment sales contract covering the purchase of the meat and groceries received in evidence as exhibit 16 also contains a provision:

"NOTICE OF CANCELLATION

"You may cancel this transaction, without any penalty or obligation, within three business days from the above date." Although this last contract is dated "2-15-77," it is clear from the testimony that the actual date of the receipt of the groceries and the execution of the agreement was February 16, 1977. It is clear from an examination of the above documents that the provisions for cancellation by the buyer are, in many respects, conflicting.

In this connection, we are forced to agree with the conclusion of the District Court that the Risons did not effectively cancel their contracts under any of the provisions for cancellation contained in the afore-mentioned contracts. Under the first provision for cancellation contained in the Membership Sales Agreement, providing that the agreement may be cancelled by notifying the home office of Guaranteed Foods, Inc., in writing within 72 hours from the delivery date of the original food order [the delivery date being February 16, 1977], it is clear from the evidence that

the Risons did not notify the home office of Guaranteed Foods in Grand Island until Sunday, February 20, 1977, a period in excess of the 72 hours granted under that provision. Had they so desired, there was ample opportunity to notify the company within the 72-hour period following the delivery of the food products. With reference to the second cancellation provision printed at the bottom of the Membership Sales Agreement, permitting cancellation at any time prior to midnight of the third business day after the date of this transaction [February 8, 1977], and also the provision contained in the installment sales contract for the membership permitting cancellation by mailing a written notice to the company before midnight of the third business day after signing the agreement [also February 8, 1977], it is equally clear that the Risons failed to comply with those provisions. Since the cancellation was first attempted on Sunday, February 20, 1977, it is obvious that more than 3 business days had elapsed after the execution of the agreements in question on February 8, 1977. We conclude that the District Court was correct in its finding that the Risons had not effectively cancelled the contracts in question by their actions on February 20, 1977.

We also point out, however, with respect to the liability for the food delivered, the contract for the sale of the food is clearly subject to the provisions of the Nebraska Uniform Commercial Code as a sale of "goods," as previously defined.

The provision with reference to the formal requirements of the statute of frauds is contained in Neb. U.C.C. § 2-201 (Reissue 1971). However, in this regard, subsection 2-201(3) provides as follows: "A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable . . . . (c) with respect to goods for which payment has been made and accepted or which have been received and accepted (section 2-606)." The evidence is uncontradicted that the Risons accepted and used the

meat and grocery products in question, and hence, under the aforementioned subsection, are liable for the value thereof; and the trial court was correct in entering judgment in favor of Guaranteed Foods for the balance due under that contract, $111.32.

We now briefly discuss the contention of the Risons that the court erred in awarding attorney fees to Guaranteed Foods. In its judgment, the District Court awarded the plaintiff, Guaranteed Foods, judgment against the defendants, the Risons, in the sum of $300 for attorney fees. The applicable section which must be considered in this connection is, as stated in the brief of the appellee, Neb. Rev. Stat. § 25-1801 (Reissue 1979). That section provides: "Any person, partnership, association, or corporation in this state having a claim, which amounts to two thousand dollars or less, against any person, partnership, association, or corporation doing business in this state, for . . . (8) charges covering articles and services affecting the life and well-being of the debtor which are adjudged by the court to be necessaries of life, may present the same to such person, partnership, association, or corporation, or to any agent thereof, for payment in any county where suit may be instituted for the collection of the same. If, at the expiration of ninety days after the presentation of such claim, the same has not been paid or satisfied, he may institute suit thereon in the proper court. If he shall establish his claim and secure judgment thereon, he shall be entitled to recover the full amount of such judgment and all costs of suit thereon, and, in addition thereto, interest on the amount of the claim at the rate of six per cent per annum from the date of presentation thereof, and, if he has an attorney employed in the case, an amount for attorney fees as provided in this section. . . ." We have held that a party must plead and prove conditions precedent to be entitled to an allowance of an attorney fee under the above section. *Haley v. Fleming*, 148 Neb. 407, 27 N.W.2d 626 (1947). There is nothing in

the record to show compliance with the conditions precedent set out in the aforementioned section, particularly that the court adjudged the items sued for, including the membership agreement, to be necessaries of life; nor that they were presented for payment and not paid within the 90 days referred to. That being so, the allowance of the attorney fees to the plaintiff in this action was error, and the judgment must be modified to eliminate the award of the attorney fees.

No other errors appearing in the record, the judgment of the District Court should be and hereby is affirmed, except as modified above.

AFFIRMED AS MODIFIED.