DONALD LAIRD, APPELLEE, V. THE SCRIBNER COOP, INC., APPELLANT.

466 N.W.2d 798

Filed March 15, 1991. No. 88-992.

534

Scott J. Norby, of Crosby, Guenzel, Davis, Kessner & Kuester, for appellant.

Steven M. Lathrop, of Hauptman, O'Brien, Wolf & Hadley, P.C., for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

HASTINGS, C.J.

The Scribner Coop, Inc. (Coop), the defendant, has appealed a judgment in the amount of $52,330.85 entered in favor of Donald Laird, the plaintiff, arising out of a lawsuit for breach of warranties of merchantability and of fitness for a particular purpose.

Laird operates his own hog breeding operation, which he described as a "farrow to finish" program. Laird has a bachelor of science degree in animal science from the University of Nebraska. He had been employed at the university's swine research center, had managed a feed mill in North Platte, had been employed as a herdsman for Hog Breeders Incorporated for a short time, had worked for 5 years for Armour & Company at its feeder pig operations, and was employed as branch manager of defendant's Winslow, Nebraska, facility for 14 years, until February 1986.

In March 1986, Laird went to Coop to purchase some feed ingredients for his hogs. While at Coop, Laird spoke with his former assistant, now the Coop's branch manager, Gary Ruwe. He was told by Ruwe about a problem with grain storage at Coop. Ruwe informed Laird that a grain bin had a "peak" that was "heating." A "peak" refers to the conelike formation of the corn at the top of the bin that is caused by filling the bin from the top. If a peak is not watched closely, moisture will collect in the peak. If the moisture is allowed to congregate at the peak, it will prevent heat from escaping the bin. This process is called

heating. With the combination of the heat and moisture, the corn collects mold and insects. Additionally, due to the heating the corn beneath the peak will discolor. If the heating is not stopped, the corn will eventually turn black or a fire may erupt.

Laird testified that he told Ruwe that "if he would pull out the center and pull out all the damaged corn and get the fines out of the center, [he] would take four loads," or approximately 1,300 bushels, of corn. Coop discounted the corn for the moisture, not for damaged corn or fines. The corn was delivered to Laird in four deliveries. The first delivery was made in early April 1986. Laird inspected the corn after it was delivered to his farm. Upon inspection, Laird noticed damaged corn and a silage odor. Silage odor occurs from a fermentation process started by the heating. Silage odor usually indicates that the corn may have mold. Laird expressed some dissatisfaction to Coop, but did not reject the corn. The second shipment also contained some damaged corn and had a silage odor. With the exception of one occasion 8 or 10 years earlier, Laird had purchased all of his corn for feed from Coop.

About a week after delivery of the first load, Laird began to feed his hogs with the corn from Coop. At this time the boars developed "pneumonia" or "flu-like symptoms." Laird stated that the hogs would vomit and would not eat regularly. When it was time for the sows to farrow, Laird noticed an abnormally high number of miscarriages, "mummies" (pigs that were not fully developed that had died in the uterus), stillborns, and cases of "fading pig syndrome." ("Fading pig syndrome" refers to pigs that are born normal, but lie down and die after the first nursing.)

After numerous attempts by veterinarians to diagnose the problem, including the submission of tissue samples from the livestock, it was concluded that the problem might be in the corn. Upon submission of a sample of the corn to the University of Nebraska on October 31, 1986, it was determined that the corn contained vomitoxin, a type of mycotoxin. The test results were received on approximately November 14. Immediately, Laird ceased incorporating the corn into his feed, informed Coop of this fact, and returned the unused corn. Coop replaced the corn. Laird's hogs started to produce normal

litters.

Although it could be inferred that it was Laird's responsibility to dry corn which he purchased from Coop with knowledge that it was moist, there was no evidence that the mycotoxin developed in the corn because of Laird's failure to properly care for the corn. There was evidence that Laird followed his customary grain-drying procedure and aerated the corn and that six of Coop's nine grain bins tested positive for mycotoxin as of May 1987. In the opinion of Dr. Busch, one of the veterinarians attending to Laird's swine herd, the production problems Laird was having were the proximate result of the animals' having been fed corn that contained vomitoxins. Ruwe agreed that corn which contained a toxic substance would not be marketable. He said that he would not knowingly sell such corn to a customer. Laird stated that he had had no experience with mycotoxins and that he knew nothing about them prior to this incident.

Evidence was introduced relating to the damages sustained by Laird. Following trial and submission to the court without a jury, a judgment was entered in favor of Laird for $52,330.85, together with costs. Coop has appealed, and we affirm.

Coop assigns as error that (1) the court failed to apply the standards of implied warranties under Neb. U.C.C. §§ 2-314 and 2-315 (Reissue 1980), (2) the court erred in finding that Laird met his burden of proof in establishing a breach of an implied warranty of merchantability, (3) the court erred in finding that Laird's notification of the alleged breach to Coop was timely, (4) the court erred in failing to apply properly the standards of consequential damages under Neb. U.C.C. § 2-715 (Reissue 1980), and (5) the court erred in finding that Laird's consequential damages were reasonably foreseeable at the time of the sale.

In reviewing the trial court's judgment in an action at law, the Supreme Court does not reweigh the evidence but, instead, considers the evidence in the light most favorable to the successful party, with conflicts resolved in favor of the successful party, who is entitled to the benefit of every inference which can reasonably be deduced from the evidence. *Metropolitan Utilities Dist. v. Pelton*, 236 Neb. 66, 459 N.W.2d

193 (1990). Additionally, the conclusion of the trial court will not be set aside unless clearly wrong. *Osmond State Bank v. Uecker Grain*, 227 Neb. 636, 419 N.W.2d 518 (1988).

This case is governed by the provisions set forth in article 2 of the Uniform Commercial Code. Article 2 covers the sale of goods. Goods are defined as "all things . . . which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid . . . ." Neb. U.C.C. § 2-105(1) (Reissue 1980). This case involves the sale of corn, a commodity which is included within the definition of goods under the U.C.C. See *Dotts v. Bennett*, 382 N.W.2d 85 (Iowa 1986).

In his petition, Laird alleges that Coop breached the implied warranty of fitness for a particular purpose, see § 2-315, and the implied warranty of merchantability, see § 2-314.

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

§ 2-315; *O'Keefe Elevator v. Second Ave. Properties*, 216 Neb. 170, 343 N.W.2d 54 (1984).

In order to recover under a warranty of fitness for a particular purpose Laird must show that (1) Coop had reason to know of Laird's particular purpose in buying the corn, (2) Coop had reason to know that Laird was relying on Coop's skill or judgment to furnish appropriate goods, and (3) Laird, in fact, relied upon Coop's skill or judgment. See *O'Keefe Elevator v. Second Ave. Properties, supra.*

The testimony indicated that Laird was a sophisticated buyer. He had had considerable experience with grain and hogs. He had in fact been the man responsible for the training of Ruwe, Coop's present manager. There is no credible evidence upon which one could conclude that Laird relied on Coop's skill and knowledge to select this particular feed corn.

We turn then to the question of the implied warranty of merchantability. Section 2-314 states:

(1) Unless excluded or modified (Section 2-316), a warranty that goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . . .

(2) Goods to be merchantable must be at least such as

(a) pass without objection in the trade under the contract description; and

(b) in the case of fungible goods, are of fair average quality with the description; and

(c) are fit for the ordinary purposes for which such goods are used; and

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

(3) Unless excluded or modified (Section 2-316) other implied warranties may arise from course of dealing or usage of trade.

For a buyer to have a claim under § 2-314 the seller must be a merchant. A "merchant" is a

person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

Neb. U.C.C. § 2-104(1) (Reissue 1980). Coop engages in the business of purchasing and selling corn; therefore, Coop qualifies as a merchant under § 2-104(1).

After goods are accepted, which they were in this instance, Laird, the buyer, has the burden of establishing any breach with respect to those goods. See Neb. U.C.C. § 2-607(4) (Reissue 1980).

Coop argues that in order for Laird to prove that the corn was unmerchantable (unfit for its ordinary purpose), Laird

must first establish the standard of merchantability in the trade. Coop relies on *Durrett v. Baxter Chrysler-Plymouth, Inc.*, 198 Neb. 392, 253 N.W.2d 37 (1977). In *Durrett*, the plaintiff's only evidence as to defectiveness of a steering column was the testimony of lay witnesses. This court affirmed the trial court's ruling sustaining the defendants' motion to dismiss on the grounds that the plaintiff failed to prove an industrial standard. The court stated: "The reliance on eyewitnesses alone is not fatal when the defect is *obvious to a layman*, but when standards of performance of the product are not generally known, other evidence, usually expert testimony, is necessary to prove proper or acceptable standards of performance." (Emphasis supplied.) *Durrett, supra* at 396, 253 N.W.2d at 39-40.

The testing done by the University of Nebraska revealed the presence of trace amounts of vomitoxin in the corn. Dr. Busch testified that in his opinion the corn contained vomitoxin and that the problems Laird was having with his swine herd were proximately caused by the vomitoxin. Additionally, Dr. Busch testified that the presence of vomitoxin in the feed will reduce pigs' immune systems. Pigs then will develop "parvo." The presence of parvo in pigs will lead to reproductive problems such as the problems experienced by Laird's pigs. It would seem quite apparent, even to a layperson, that a substance present in corn which would cause production problems such as mummies, stillborns, and postbirth death in hogs would be unfit for its ordinary purpose. Additionally, Coop's own branch manager conceded that corn with a toxic substance in it would not be merchantable.

The fact remains that Coop offered for sale corn which its customers should be able to assume was merchantable, but which contained toxic substances. There was sufficient competent evidence to support the trial court's finding that Coop breached the implied warranty of merchantability.

We deal next with the reasonableness of Laird's notice to Coop. Section 2-607(3) provides: "Where a tender has been accepted (a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy . . . ."

It would appear from the evidence that Laird did accept delivery. The corn was delivered to Laird in April 1986. Although symptoms appeared shortly after he began to feed this corn, Laird did not know that his problems were caused by the corn. It was not until October that the veterinarian even suspected the corn, and it was not until November that these suspicions were confirmed. Laird, upon receiving this information from his veterinarian, immediately gave notice to Coop and returned the unused corn. It is beyond argument in this case that the notice was given within a reasonable time.

Although Coop does not contest the amount of consequential damages or the method by which they were proved, it does contend that Laird's consequential damages were not reasonably foreseeable at the time of the sale. Section 2-715(2)(a) states that consequential damages resulting from a seller's breach include "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise . . . ."

Coop knew that Laird conducted a pig breeding and feeding operation and that he bought the corn to feed to pigs. Coop also acknowledged that it itself would not buy corn if the corn had mycotoxins in it. Additionally, it was aware of the fact that corn which is peaked is apt to heat, which in turn will cause mold, and indicated that it would not knowingly sell corn that contained a toxic substance to a customer.

The foreseeability of consequential damages, as a general rule, is an issue of fact for determination by the fact finder. "There was sufficient evidence from which the [court] could conclude the [seller] could reasonably have forseen [sic] the [buyer] would sustain consequential damages by [seller's] breach of the contract." *National Farmers Organization, Inc. v. McCook Feed & Supply Co.*, 196 Neb. 424, 432, 243 N.W.2d 335, 340 (1976). Such was the case here. See, also, *Shotkoski v. Standard Chemical Manuf. Co.*, 195 Neb. 22, 237 N.W.2d 92 (1975).

The judgment of the district court is affirmed.

AFFIRMED.