WILLIAM TIMOTHY ADAMS AND CAROL ADAMS, APPELLEES, V. AMERICAN CYANAMID COMPANY, A CORPORATION, APPELLANT.
498 N.W.2d 577

Filed November 10, 1992.   No. A-91-944.

Frederick S. Cassman and Aaron D. Weiner, of Abrahams, Kaslow & Cassman, and J.L. Zimmerman, of Atkins, Ferguson, Zimmerman & Carney, P.C., for appellant.

John F. Simmons, of Simmons, Olsen, Ediger & Selzer, P.C., for appellees.

SIEVERS, Chief Judge, and CONNOLLY and MILLER-LERMAN, Judges.

CONNOLLY, Judge.

## I. INTRODUCTION

This appeal arises from an action based on theories of strict liability and breach of warranty of merchantability under the Uniform Commercial Code. William Timothy "Tim" Adams and Carol Adams brought suit against American Cyanamid Company and Panhandle Cooperative Association for damages sustained to a crop of edible beans which was lost after a herbicide manufactured by American Cyanamid was applied to the Adamses' fields. The jury awarded a judgment for the Adamses in the amount of $193,500 against American Cyanamid. American Cyanamid appeals. We affirm in part, and in part reverse and remand for a new trial.

## II. FACTUAL BACKGROUND

In 1989, Tim Adams planned to grow beans on 860 acres of center-pivot irrigated fields. He sought the services of Glenn Johnson of Servi-Tech crop consultants to inspect his fields; to make recommendations as to fertilizers, herbicides, and seed; and to observe the crop through the growing season. Johnson recommended a combination of the herbicides Eptam and Prowl. Prowl herbicide is manufactured by the defendant, American Cyanamid. Adams purchased these herbicides from Panhandle Co-op, whose employee applied the herbicides at the application rate specified by Johnson. In early June, the fields were planted with great northern and pinto beans.

At first, the bean crop grew well, but after the first of July, Adams noticed that the plants in field No. 8 began to look weakened, and plants in the other fields followed suit. The beans flourished in a strip of field No. 1 where no herbicide had been applied due to a parked center pivot. The beans also flourished in a 10-acre area of field No. 5 where no herbicide was applied because the sod had recently been brought under cultivation.

Prowl, the trade name for the herbicide used, is a dinitroaniline herbicide, which can destroy plants by causing a swollen hypocotyl, i.e., the plant's main root stem, and a reduction of the secondary root system.

Prowl was applied in combination with Eptam, a

thiocarbamate herbicide. A thiocarbamate herbicide produces a type of plant injury different from that produced by a dinitroaniline herbicide. A thiocarbamate herbicide causes early leaf effect and lasts in the soil for a few weeks. The Adamses' expert was able to exclude the possibility that Eptam had caused the plant injury.

The jury entered a general verdict for the Adamses for $193,500, the amount of the lost crop. The jury entered special verdicts finding that the defendant was strictly liable in tort and had breached the warranty of merchantability. The defendant moved for judgment notwithstanding the verdict and for a new trial, which motions were overruled.

### III. ASSIGNMENTS OF ERROR

The defendant's assignments of error may be reduced to the following claims: (1) The court erred in failing to sustain the defendant's motions for a directed verdict and motion for judgment notwithstanding the verdict because there was insufficient evidence for the jury to find that the defendant was strictly liable for the damage to the plaintiffs' crops; (2) the court erred in failing to sustain the defendant's motions for a directed verdict and motion for judgment notwithstanding the verdict because there was insufficient evidence for the jury to find that the herbicide sold to the plaintiffs was not merchantable; (3) the court erred in instructing the jury to determine whether the disclaimer was conspicuous, contrary to Neb. U.C.C. § 1-201(10) (Cum. Supp. 1990); (4) the court erred in failing to sustain the defendant's motions for a directed verdict and motion for judgment notwithstanding the verdict because the herbicide label contained a conspicuous disclaimer of the implied warranty of merchantability as a matter of law; (5) the court erred in failing to sustain the defendant's motions for a directed verdict and motion for judgment notwithstanding the verdict because the plaintiffs' knowledge of the disclaimer on the herbicide label, through their agent, excluded the implied warranty of merchantability as a matter of law; and (6) the court erred in failing to rule on the unconscionability of the limitation of damages clause on the herbicide label, pursuant to Neb. U.C.C. § 2-302 (Reissue

1980), thereby failing to find and instruct the jury that the limitation of damages clause in the herbicide label excluded the plaintiffs' recovery of consequential damages from breach of warranty.

## IV. ANALYSIS
### 1. DIRECTED VERDICT AND JUDGMENT NOTWITHSTANDING THE VERDICT

Generally, the defendant claims that the trial court erred by failing to sustain its motions for directed verdict and for judgment notwithstanding the verdict because there was insufficient evidence to support the jury's verdict finding the defendant liable on theories of strict liability and breach of warranty of merchantability. These assignments will be considered together because they must be reviewed under the same standards.

A trial court should direct a verdict as a matter of law only when the facts are conceded, undisputed, or such that reasonable minds can draw but one conclusion therefrom. The party against whom the motion is made is entitled to have every controverted fact resolved in his or her favor and to have the benefit of every inference which can reasonably be drawn from the evidence. If there is any evidence which will sustain a finding for the party against whom the motion is made, the case may not be decided as a matter of law. *Baker v. St. Paul Fire & Marine Ins. Co.*, 240 Neb. 14, 480 N.W.2d 192 (1992).

On a motion for judgment notwithstanding the verdict, the moving party is deemed to have admitted as true all the material and relevant evidence admitted which is favorable to the party against whom the motion is directed, and, further, the party against whom the motion is directed is entitled to the benefit of all proper inferences which can be deduced therefrom. *Pugh v. Great Plains Ins. Co.*, 239 Neb. 171, 474 N.W.2d 677 (1991).

### (a) Strict Liability

The defendant claims the trial court erred in overruling its motions for a directed verdict and for judgment notwithstanding the verdict because there was insufficient evidence for a jury to find the defendant liable on a theory of strict liability. The Adamses' suit was based on Restatement

(Second) of Torts § 402 A at 347-48 (1965), which in relevant part provides: "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property." The elements in a prima facie case in strict liability depend on the type of defect that is asserted. The Supreme Court has said:

> In products liability litigation the notion of a defective product embraces two separate concepts. The first, commonly labeled a manufacturing defect, is one in which the product differs from the specifications and plan of the manufacturer. . . .
>
> The second concept of a defective product is one in which the product meets the specifications of the manufacturer but the product nonetheless poses an unreasonable risk of danger. This condition is generally characterized as a design defect. . . .
>
> While a particular design may pose such an unreasonable risk of danger, liability for this danger differs, depending upon the theory of recovery presented by the plaintiff. . . .
>
> In a strict liability cause of action it is generally proposed that the focus of the court's inquiry should be on the product itself and not the manufacturer. Thus, a finding that the product poses an unreasonable risk of danger is sufficient.

*Nerud v. Haybuster Mfg.*, 215 Neb. 604, 610-11, 340 N.W.2d 369, 373-74 (1983).

The Adamses did not claim that American Cyanamid's product was subject to a manufacturing defect, or stated differently, they concede that Prowl did conform to the chemical description on the label. Therefore, the question is whether the evidence is sufficient to support the jury's finding on strict liability for a design defect. According to *Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 441, 412 N.W.2d 56, 69 (1987), to recover on a claim of strict liability in tort for a defectively designed product, a plaintiff must prove the following by a preponderance of the evidence:

(1) The defendant placed the product on the market for

use and knew, or in the exercise of reasonable care should have known, that the product would be used without inspection for defects; (2) the product was in a defective condition when it was placed on the market and left the defendant's possession; (3) the defect was the proximate or a proximately contributing cause of plaintiff's injury sustained while the product was being used in the way and for the general purpose for which it was designed and intended; (4) the defect, if existent, rendered the product unreasonably dangerous and unsafe for its intended use . . . and (6) plaintiff's damages were a direct and proximate result of the alleged defect.

In the instant case, there is no question that it was foreseeable to American Cyanamid that its product would be used by a farmer without inspection. Moreover, if the product was defective, it was defective when it was placed on the market and left American Cyanamid's possession. Nevertheless, no evidence was adduced to show that Prowl was unreasonably dangerous. The Supreme Court has stated:

"This court has defined the term 'unreasonably dangerous' to mean that the product has a propensity for causing physical harm beyond that which would be contemplated by the ordinary user or consumer who purchases it, with the ordinary knowledge common to the foreseeable class of users as to its characteristics. . . ."

*Rahmig v. Mosley Machinery Co.*, 226 Neb at 440, 412 N.W.2d at 69 (quoting *Nerud v. Haybuster Mfg., supra*).

Because the Adamses have failed to make a prima facie case that the herbicide was unreasonably dangerous, their cause of action for strict liability must fail. Accordingly, we hold that it was error for the court to overrule the defendant's motions for directed verdict and for judgment notwithstanding the verdict on this count. Our holding makes it unnecessary to consider the defendant's assignment of error based on its motion to strike the strict liability count.

### (b) Breach of Warranty

The defendant also claims that the Adamses presented insufficient evidence to prove there was a breach of the implied

warranty of merchantability and that the trial court erred by failing to direct a verdict against the Adamses on this theory of recovery.

Neb. U.C.C. § 2-314 (Reissue 1980) provides:

(1) Unless excluded or modified (Section 2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . . .

(2) Goods to be merchantable must be at least such as

. . . .

(c) are fit for the ordinary purposes for which such goods are used.

There is no question that American Cyanamid is a merchant, i.e., one that deals in the goods of the kind involved in the transactions under consideration. See Neb. U.C.C. § 2-104 (Reissue 1980).

After goods are accepted, the buyer has the burden of establishing any breach with respect to those goods. *Laird v. Scribner Coop*, 237 Neb. 532, 466 N.W.2d 798 (1991).

The plaintiffs' prima facie case for breach of warranty of merchantability has been described in *Delgado v. Inryco, Inc.*, 230 Neb. 662, 433 N.W.2d 179 (1988):

"[T]here must be proof that there was a deviation from the standard of merchantability at the time of sale and that such deviation caused the plaintiff's injury both proximately and in fact. Thus, a breach of the warranty has been found to exist where the item sold failed to perform adequately because of a lack of quality inherent within the item itself."

*Id.* at 668, 433 N.W.2d at 183-84 (quoting *O'Keefe Elevator v. Second Ave. Properties*, 216 Neb. 170, 343 N.W.2d 54 (1984)).

The *Delgado* court also stated, "In proving a deviation from the standard of merchantability, some proof of noncompliance with the warranty must be presented." *Id.* at 668, 433 N.W.2d at 184. A plaintiff may not rely on the sole fact that an accident occurred. See *Delgado v. Inryco, Inc., supra*.

In the case at bar, the defendant argues that "[t]here was no proof by the plaintiffs that the risk of harm from the Prowl herbicide was any greater than herbicides in its class generally,

and there was no evidence as to any breach of a standard of merchantability." Brief for appellant at 30.

In *Laird v. Scribner Coop, supra,* the Supreme Court held that " 'reliance on eyewitnesses alone is not fatal when the defect is *obvious to a layman,* but when standards of performance of the product are not generally known, other evidence, usually expert testimony, is necessary to prove proper or acceptable standards of performance.' " (Emphasis in original.) *Id.* at 539, 466 N.W.2d at 804 (quoting *Durrett v. Baxter Chrysler-Plymouth, Inc.,* 198 Neb. 392, 253 N.W.2d 37 (1977)).

It would seem apparent to a layperson that the standard of merchantability for herbicides is that they should not damage the crops to which they are applied. Therefore, expert testimony was not required to establish a standard of merchantability.

As to the existence of a breach of the standard, the evidence at trial was in conflict. Prof. Eugene Heikes, called by the Adamses, testified that a dinitroaniline herbicide affects plants through their root system, attacking the hypocotyl, or main root, and the secondary roots which branch therefrom. He also testified that the growth of the bean plants he inspected was stunted because of their swollen hypocotyl and the lack of a secondary root system.

Dr. Raymond Ward, a soil testing specialist called by the defendant, testified that the injury to the root system was not caused by the herbicide, but by the quality of water from the deep wells used to irrigate the fields. He testified that the irrigation water contained sodium, chlorides, and boron and that dry beans are especially susceptible to injury from the concentration of such salts in the soil.

Whether there was a breach of implied warranty of merchantability is a factual question for jury determination. Professor Heikes testified that injury to the plants was caused by the effects of dinitroaniline substances. It was undisputed that Prowl contained dinitroaniline. Professor Heikes' testimony was sufficient for the jury to have concluded that the herbicide in question was not suitable for its ordinary use in controlling weeds in dry beans.

Therefore, we hold that the Adamses presented sufficient evidence as to a breach of a standard of merchantability. Accordingly, we affirm that portion of the court's judgment overruling the motions for directed verdict and for judgment notwithstanding the verdict to the Adamses' theory of recovery based on implied warranty of merchantability.

We note at this point that the defendant also claims error based on the court's failure to instruct the jury on intervening cause. We do not consider intervening cause an appropriate defense to the Adamses' claim for breach of warranty. The defense of intervening cause is appropriately applied when it is claimed that the defendant is negligent. Moreover, an efficient intervening cause is a new and independent act, itself a proximate cause of an injury, which breaks the causal connection between the original wrong and the injury. *Delaware v. Valls*, 226 Neb. 140, 409 N.W.2d 621 (1987). In the instant case, the jury was instructed on proximate cause. Since an intervening cause is a proximate cause, the court's instruction adequately covered the applicable law.

2. JURY INSTRUCTION ON CONSPICUOUSNESS OF DISCLAIMER

The defendant claims that the court erred by submitting the issue of the conspicuousness of the disclaimer to the jury.

In an appeal based on the claim of an erroneous instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *Pugh v. Great Plains Ins. Co.*, 239 Neb. 171, 474 N.W.2d 677 (1991).

The "label" in this case was contained in exhibit 166, a 107-page manual on various herbicides. The label applying to Prowl herbicide appears on page 17 of that manual and provides:

DISCLAIMER

. . . .

American Cyanamid Company warrants only that the material contained herein conforms to the chemical description on the label and is reasonably fit for the use therein described when used in accordance with the directions for use, subject to the risks referred to above.

. . . .

American Cyanamid Company makes no other express or implied warranty, including any other express or implied warranty of FITNESS or MERCHANT-ABILITY.

At trial, the issue of whether the label was conspicuous was submitted to the jury. Instruction No. 4, given by the trial court, informed the jury that it was required to find whether the disclaimer was conspicuous with respect to the exclusion of the warranty of merchantability, fitness, and consequential damages.

Section 1-201(10) reads: "Whether a term or clause is 'conspicuous' or not is for decision by the court." On the basis of § 1-201(10), we hold that the trial court erred in submitting the issue of the label's conspicuousness to the jury. However, such error would be prejudicial only if it adversely affected the defendant's substantial rights. Since the defendant would have a substantial right affected only if the disclaimer is conspicuous as a matter of law, we first resolve that issue and then return to whether prejudice arose from the jury instruction.

### 3. LABEL CONSPICUOUS AS A MATTER OF LAW

The defendant claims that its disclaimer was conspicuous as a matter of law and that the court ought to have directed a verdict against the Adamses on their theory of recovery for breach of warranty. Neb. U.C.C. § 2-316(2) (Reissue 1980) reads:

Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. . . .

The warranty in the instant case mentions merchantability, and the heading "DISCLAIMER" is prominently displayed. The disclaimer is sufficiently set off from other material so as to draw attention to itself. Also, the disclaimer is on the third page of the label, although the record establishes that the only label presented to Adams was contained in a manual. Therefore,

notwithstanding the fact that the label appears in a manual, we hold that the disclaimer was conspicuous as a matter of law. See *Architectural Aluminum Corp. v. Macarr, Inc.*, 70 Misc. 2d 495, 333 N.Y.S.2d 818 (1972) (disclaimer in catalog furnished to buyer conspicuous, where it was separately set forth from other matter).

### 4. ADAMS' ACTUAL KNOWLEDGE OF THE DISCLAIMER

A closely related issue, which is likely to be confused with the issue of receipt by Adams, is whether the Code requires that a disclaimer actually be read or whether it only requires that the disclaimer be conspicuous. Section 1-201(10) reads: "A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it." On the basis of § 1-201(10), some courts have held that a disclaimer may be effective notwithstanding the fact that a buyer has not read it. See, *Earl Brace & Sons v. Ciba-Geigy Corp.*, 708 F. Supp. 708 (W.D. Pa. 1989) (farmer who was presented disclaimer but did not read it was bound because he had read similar disclaimers); *Childers & Venters, Inc. v. Sowards*, 460 S.W.2d 343 (Ky. 1970) (buyer of coal truck presented disclaimer on contract, but did not read it before signing); *Architectural Aluminum Corp. v. Macarr, Inc., supra* (disclaimer contained in manual which was not read); 3 Ronald A. Anderson, Anderson on the Uniform Commercial Code § 2-316:32 and 2-316:33 (3d ed. 1983). However, in all these cases it was undisputed that the buyer had actually received the label containing the disclaimer.

In the case at bar, by contrast, Adams denied receiving the label at the time he purchased the herbicides. Some testimony indicated that Adams was presented exhibit 166, a 107-page manual on various herbicides, which contains the disclaimer at page 19. Dan Keener, the fertilizer manager of the Panhandle Co-op, testified that he gave the manual to Adams when Adams came into the office to purchase the herbicides.

Adams testified that Keener did not give him the manual; Adams also stated that he felt no need to read the directions because he was not applying the herbicide.

The defendant claims that a disclaimer is effective so long as

it is conspicuous and that it is unnecessary that it be received by the buyer. The defendant also urges this court to apply *Kennedy v. Cornhusker Hybrid Co.*, 146 Neb. 230, 19 N.W.2d 51 (1945), in which the Nebraska Supreme Court held that actual knowledge of a disclaimer by the buyer is not necessary if it is printed on the package containing the article or upon an invoice or catalog, so that it might have come to the buyer's attention.

We decline to apply *Kennedy* because we believe that case does not dispose of the issue presented here. The *Kennedy* case was decided under the Uniform Sales Act. Moreover, in *Kennedy* the article in question actually came into the possession of the buyer, and the only dispute was whether the disclaimer was attached to the article. Because Adams denies that he received possession of either the article or the disclaimer, this case is governed by the reasoning of *Eichenberger v. Wilhelm*, 244 N.W.2d 691 (N.D. 1976). In *Eichenberger*, a spraying service applied herbicide to a farmer's wheat crop to control wild oats. The herbicide as applied resulted in a "despoliation" of the wheat. The court held that the disclaimer was ineffective and stated:

> [T]he evidence in this case establishes that Eichenberger was not shown the label. Where the buyer is given no opportunity to see and read the label, this court will not elevate the disclaimer to status as a part of the bargain. Since Eichenberger did not read the label, we also agree with the trial court's finding that he did not assume the risk that his wheat crop would be substantially and permanently damaged.

*Id.* at 697.

Similarly, in *Willoughby v. Ciba-Geigy Corp.*, 601 S.W.2d 385 (Tex. Civ. App. 1979), the plaintiff farmers asked the herbicide dealer to apply a postemergence herbicide to control weeds in corn. The herbicide dealer applied the substance to the corn plants, which were killed. The court held:

> The evidence in this case clearly shows the disclaimer of warranty was never disclosed or brought to the attention of appellants, who had not, at any time, come into possession of the container. Appellants did not see the disclaimer; the container upon which the disclaimer

appeared was never in their possession, and it was not called to their attention by [the herbicide dealer]. Under these circumstances, we hold the disclaimer relied upon by appellees was ineffective to relieve appellees of liability.

*Id*. at 388. See, also, *Board of Directors v. Southwestern Petro.*, 757 S.W.2d 669 (Tenn. App. 1988) (there must be assent to terms of disclaimer and proof that the parties actually bargained over terms).

It is clear from these cases that the mere fact that a disclaimer of the implied warranty of merchantability is conspicuous will not relieve a seller of liability if the buyer never receives the disclaimer. See, *Eichenberger v. Wilhelm, supra*; *Willoughby v. Ciba-Geigy Corp., supra*. Conversely, if a disclaimer is conspicuous, it is effective so long as the buyer receives the disclaimer and has a reasonable opportunity to read it. See, *Earl Brace & Sons v. Ciba-Geigy Corp.*, 708 F. Supp. 708 (W.D. Pa. 1989); *Childers & Venters, Inc. v. Sowards*, 460 S.W.2d 343 (Ky. 1970). Therefore, we hold that in order for the disclaimer in the case at bar to be effective, the defendant must establish that the disclaimer came into Adams' possession, so that he had an opportunity to see and read the disclaimer or, at the least, that the terms of the disclaimer were brought to Adams' attention. On remand, the court is directed to so instruct the jury.

## 5. JOHNSON'S AGENCY

The defendant claims that even if Adams never received the label, notice or knowledge of the disclaimer is imputed to the Adamses through their agent, Johnson. We address this issue here as it is likely to arise on remand.

Even if Johnson was the agent of the Adamses, which we need not decide, the cases require that the disclaimer be presented to the purchaser if it is to become part of the bargain. See, *Eichenberger v. Wilhelm, supra*; *Willoughby v. Ciba-Geigy Corp., supra*. The defendant does not claim that Johnson was the purchaser or even that he purchased as the Adamses' agent. Johnson was retained solely to recommend types of herbicide and to oversee their application. In fact, the defendant's own evidence tended to establish that Adams

purchased the herbicides. Accordingly, this assignment of error is without merit.

Although the disclaimer was conspicuous as a matter of law, a directed verdict was not warranted because a factual issue existed as to whether Adams ever received the label on which the disclaimer was printed. The court's error, instead, lies in the fact that it failed to instruct the jury to find whether Adams had actually received the label. Where an examination of the instructions given by the trial court discloses plain error indicative of a probable miscarriage of justice, the judgment will be reversed in favor of remanding the cause for new trial, even absent a proper objection by counsel. *Enyeart v. Swartz*, 218 Neb. 425, 355 N.W.2d 786 (1984).

Because the trial court failed to instruct on the issue of Adams' receipt of the disclaimer, the jury could have improperly found that the disclaimer was not conspicuous, while at the same time believing or concluding that Adams actually received the disclaimer or believing that the receipt of the disclaimer made no difference. Not only was the defendant prejudiced by the court's submission of the issue of conspicuousness to the jury, but the failure of the district court to instruct on the issue of Adams' receipt of the disclaimer is plain error indicative of a probable miscarriage of justice. We therefore remand the cause for a new trial.

## 6. UNCONSCIONABILITY

In its final assignment of error, the defendant claims that the trial court erred (1) by failing to rule on the unconscionability of the limitation of remedy found on its label, pursuant to § 2-302; (2) by failing to find that the Adamses were excluded by the disclaimer from claiming consequential damages; and (3) by failing to instruct the jury that the limitation of remedy clause excluded the Adamses' recovery of consequential damages for breach of warranty.

### (a) Consequential Damages Defined

At the outset, we must determine whether this case involves direct or consequential damages. Neb. U.C.C. § 2-719(3) (Reissue 1980) reads: "Consequential damages may be limited or excluded unless the limitation or exclusion is

unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not."

American Cyanamid's disclaimer provides, inter alia: "Any damages arising from a breach of this warranty shall be limited to direct damages, and shall not include consequential commercial damages such as loss of profits or values or any other special or indirect damages."

The Adamses are clearly seeking consequential damages as defined in Neb. U.C.C. § 2-715(2) (Reissue 1980). In *Duyck v. Northwest Chemical Corp.*, 94 Or. App. 111, 116-17, 764 P.2d 943, 946 (1988), the Code's definition of consequential damages was explained as follows:

> Consequential damages, as opposed to direct damages, do not arise directly according to the usual course of things from the breach itself; rather, they occur as a consequence of special circumstances known or reasonably supposed to have been contemplated by the parties when the contract was made. In other words, [§ 2-715(2)] includes loss resulting from general or particular requirements which Dupont had reason to know about at the time of the contracting.

In this case, the special circumstances are that Prowl can be injurious to crops, when applied to soils with high salinity, according to expert testimony for the defendant. The defendant claimed that damages were a consequence of such special circumstances. The consequences were known or reasonably should have been contemplated by the parties. Therefore, this case is concerned with consequential damages rather than direct damages.

### (b) Conspicuousness of Limitation of Remedies

We must also decide as a preliminary to our analysis of the unconscionability issue whether the limitation of consequential damages must also be conspicuous. The issue of the conspicuousness of the limitation of remedy is separate from that of conspicuousness of the disclaimer of warranty. The Code does not require that a limitation of remedy be

conspicuous. See 5 Ronald A. Anderson, Anderson on the Uniform Commercial Code § 2-719:20 (3d ed. 1984). Nevertheless, we believe that the requirement of § 2-316(2) that a disclaimer of warranty of merchantability be conspicuous also applies to limitations of remedies. Section 2-316(2) reads as follows:

> Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. . . .

A court will construe statutes relating to the same subject matter together so as to maintain a consistent and sensible scheme. *In re Estate of Morse*, 241 Neb. 40, 486 N.W.2d 195 (1992). We have held above that a disclaimer of warranty must be conspicuous and that the buyer must have an opportunity to see and read it if it is to become part of the bargain of sale. On similar reasoning, in order for a limitation of remedy to be effective, it must also be conspicuous and a buyer must be afforded a reasonable opportunity to read it. See, *Apex Supply Company, Inc. v. Benbow Industries, Inc.*, 189 Ga. App. 598, 376 S.E.2d 694 (1988); *Ins. Co. of North America v. Automatic Sprinkler Corp.*, 67 Ohio St. 2d 91, 423 N.E.2d 151 (1981); *Seibel v. Layne & Bowler, Inc.*, 56 Or. App. 387, 641 P.2d 668 (1982), *petition for review denied* 293 Or. 190, 648 P.2d 852. Contra, *Boone Val. Coop. Proc. Ass'n v. French Oil Mill Mach. Co.*, 383 F. Supp. 606 (N.D. Ia. 1974); *Collins Radio Co. of Dallas v. Bell*, 623 P.2d 1039 (Okla. App. 1980); *Flintkote v. Wilkinson*, 220 Va. 564, 260 S.E.2d 229 (1979); *Fargo Mach. & Tool Co. v. Kearney & Trecker Corp.*, 428 F. Supp. 364 (E.D. Mich. 1977).

Because we have held that the disclaimer of the warranty is conspicuous as a matter of law, we also hold that the limitation of remedies is conspicuous.

### (c) Conscionability Hearing

Having disposed of these preliminary issues, we now address the defendant's final assignment of error. The defendant first

claims that the trial court erred by not holding a conscionability hearing on its limitation of remedy.

*Guaranteed Foods v. Rison*, 207 Neb. 400, 407, 299 N.W.2d 507, 512 (1980), states that "the issue of unconscionability must be pleaded in order to be considered by the court." The issue of unconscionability was raised in the Adamses' reply to the defendant American Cyanamid's answer.

Limitations of remedy are governed by § 2-719(3), which states that "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable." Section 2-302 requires that the trial court make a conscionability determination for contracts in general; however, § 2-719 is silent on the issue.

We believe that the requirement that an unconscionability hearing be held under § 2-302 also applies to determinations of whether limitations of remedies are unconscionable under § 2-719(3). However, § 2-302(2) requires only that a party be afforded a reasonable opportunity to be heard. So long as sufficient evidence has been adduced concerning the commercial setting, purpose, and effect of the clause or contract, it is not necessary that a special hearing be held to determine whether a limitation of remedies is unconscionable. Rather, the issue may be raised at any time in the proceeding. See *Herrick v. Monsanto Co.*, 874 F.2d 594 (8th Cir. 1989). See, also, 2 Ronald A. Anderson, Anderson on the Uniform Commercial Code § 2-302:95 (3d ed. 1982). Contra *Fusco v. General Motors Corp.*, 126 Misc. 2d 998, 485 N.Y.S.2d 431 (1984) (to determine whether exclusion of liability for consequential damages is unconscionable, it is necessary that a hearing be held).

In the case at bar, sufficient evidence had been adduced concerning the enforceability of the exclusion of consequential damages. The defendant had a reasonable opportunity to request a hearing on the issue of the enforcement of the provision excluding consequential damages. It never requested a hearing. The defendant did not raise the issue on its motion for directed verdict at the instruction conference or in its motion for judgment notwithstanding the verdict. The issue was not raised at any of these points, and the defendant can

hardly complain on appeal that it was prejudiced. See *Guaranteed Foods v. Rison, supra.*

### (d) Determination of Unconscionability

The defendant claims that it was error for the trial court not to address the unconscionability of the exclusion. Since the issue is likely to arise again on remand, we provide direction for the lower court by determining in advance whether American Cyanamid's limitation of remedies is unconscionable.

The concept of conscionability is not defined by the Code. The Supreme Court has quoted with approval from the comments to § 2-302: " ' "The basic test is whether in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable *under the circumstances existing at the time of the making of the contract. . . .*" ' " (Emphasis in original.) *T. V. Transmission v. City of Lincoln,* 220 Neb. 887, 896, 374 N.W.2d 49, 56 (1985).

Although the test is stated in *T. V. Transmission,* we have not found a Nebraska case that has applied it. Accordingly, we must determine how the concept of unconscionability is to be applied. The Code's concept of unconscionability developed in the context of consumer transactions. Since our concern here is solely with a commercial contract, we must determine how the concept applies in a commercial setting.

Generally, the issue of unconscionability is divided into substantive unconscionability and procedural unconscionability. "Substantive unconscionability involves those cases where a clause or term in the contract is alleged to be one-sided or overly harsh, while procedural unconscionability relates to impropriety during the process of forming a contract." *Schroeder v. Fageol Motors,* 86 Wash. 2d 256, 260, 544 P.2d 20, 23 (1975). Generally, a contract is not substantively unconscionable unless the terms are grossly unfair under the circumstances as they existed at the time the contract was formed. See *Guthmann v. La Vida Llena,* 103 N.M. 506, 709 P.2d 675 (1985). An often-quoted formulation of substantive unconscionability is the following:

In determining reasonableness or fairness, the primary

concern must be with the terms of the contract considered in light of the circumstances existing when the contract was made. The test is not simple, nor can it be mechanically applied. The terms are to be considered "in the light of the general commercial background and the commercial needs of the particular trade or case." Corbin suggests the test as being whether the terms are "so extreme as to appear unconscionable according to the mores and business practices of the time and place."

*Williams v. Walker-Thomas Furniture Company*, 350 F.2d 445, 450 (D.C. Cir. 1965). Accordingly, to determine whether a contract clause is substantively unconscionable, a court asks "whether under the circumstances existing at the time of making of the contract, and in light of the general commercial background and commercial needs of a particular case, clauses are so one-sided as to oppress or unfairly surprise one of the parties." *Barnes v. Helfenbein*, 548 P.2d 1014, 1020 (Okla. 1976).

In the present case, the limitation of consequential damages clause would leave the herbicide user without any substantial recourse for his loss. "One-sided agreements whereby one party is left without a remedy for another party's breach are oppressive and should be declared unconscionable." *Durham v. Ciba-Geigy Corp.*, 315 N.W.2d 696, 700 (S.D. 1982). See, also, *Campbell Soup Co. v. Wentz*, 172 F.2d 80 (3d Cir. 1948). We conclude that the provision excluding consequential damages is substantively unconscionable.

Substantive unconscionability in a commercial setting, standing alone, is insufficient to void a contract or clause. See, e.g., 1 E. Allan Farnsworth, Contracts § 4.28 (2d ed. 1990). The remaining question, therefore, is whether there is evidence of procedural unconscionability. The factors involved in determination of procedural unconscionability have been formulated in *American Nursery v. Indian Wells*, 115 Wash. 2d 217, 797 P.2d 477 (1990). In *American Nursery*, the court stated that a clause excluding damages may be found to be conscionable when "the general commercial setting indicates a prior course of dealing or reasonable usage of trade as to the exclusionary clause." *Id*. at 223, 797 P.2d at 481. Otherwise,

> [u]nconscionability is determined in light of all the surrounding circumstances, including (1) the manner in which the parties entered into the contract, (2) whether the parties had a reasonable opportunity to understand the terms of the contract, and (3) whether the important terms were hidden in a maze of fine print.

*Id.* at 222, 797 P.2d at 481. None of the factors is conclusive; rather, unconscionability is determined under the totality of the circumstances.

Applying the *American Nursery* analysis, we first look to evidence of a prior course of trade. This inquiry has been explained as follows:

> [A court] must consider whether the plaintiff and [defendant], through prior contracts, had established a consistently adhered to policy of excluding consequential damages, or whether it is a recognized practice within the trade to exclude consequential damages. The presence of either of these elements, unless the trade practice as related to the plaintiff was clearly unreasonable, would support a finding of conscionability in spite of a lack of "negotiations" or the "inconspicuous" appearance of the clause.

*Schroeder v. Fageol Motors*, 86 Wash. 2d at 260-61, 544 P.2d at 23-24.

Although the evidence supports the conclusion that there is a trade practice among chemical firms related to excluding consequential damages, we find it unreasonable to impose the trade practice on the Adamses. In selecting Prowl herbicide, Adams was merely following the advice of Johnson. He was not independently assessing the risks involved in the use of particular chemicals; and the use of middlemen, as in the case at bar, appears to be a common trade practice in the agricultural industry.

Therefore, we examine the totality of the circumstances. In this case, Adams was in no position to bargain with American Cyanamid. Johnson testified that all herbicide manufacturers place the same disclaimers on their products. Moreover, Adams testified that he did not receive the label containing the exclusion until he had problems with his crops. Even if we

disregard the fact that Adams may not have received the contract terms at the time of purchase, the language of the exclusion is not such as to be immediately understandable by a layperson such as Adams. The exclusion specifically excludes "indirect" damages, but allows direct damages without specifying the extent of such damages.

This is a situation where the Adamses had no alternative other than to accept the manufacturer's exclusion. The undisputed evidence is that Adams could not purchase any manufacturer's herbicide without such an exclusion. The Adamses were not in a position to bargain with the defendant for more favorable terms than those set out in the preprinted label. Nor were they in a position to test the effectiveness of the herbicide prior to purchase. As Adams expected, the herbicide he purchased killed the weeds in his crop. However, quite unexpectedly and unfortunately, the herbicide also destroyed his crop.

If the evidence is believed, to permit the defendant to escape all consequential responsibility by inserting a limitation of consequential damage clause, as in this case, would leave a farmer without any substantial recourse for his loss. We conclude that under the circumstances presented here, the exclusion is procedurally unconscionable. Having found the exclusion both substantively and procedurally unconscionable, we decline to enforce it.

## V. CONCLUSION

We reverse that portion of the district court's judgment overruling the defendant's motions for directed verdict on the strict liability count. We affirm that portion of the district court's judgment overruling the defendant's motions for directed verdict and for judgment notwithstanding the verdict on the Adamses' theory of recovery based on breach of the implied warranty of merchantability, but we remand because the district court improperly submitted the issue of the disclaimer's conspicuousness to the jury.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED FOR A NEW TRIAL.